MARY M. BAUGHER ET AL. *vs.* AUGUST GESELL ET AL.

*Wills—Caveat—Insufficiency of Evidence to Show Lack of Testamentary Capacity or Ignorance of Contents of Will—Hypothetical Question to Medical Expert—Instructions to the Jury.*

When the evidence is clear and uncontradicted that the witnesses to a will saw the testator sign the same and signed their names in the presence of the testator and of each other, an instruction to the jury that

their verdict upon an issue involving the execution of the will must be for the defendants, instead of leaving the finding of the facts to them, is not reversible error.

The evidence produced by the caveators, upon the trial of an issue involving the capacity of the testator to make a valid deed or contract, examined and held to be legally insufficient to prove that the testator was mentally incompetent.

The evidence in this case held to be insufficient as a matter of law to show that the testator at the time of executing his will did not know the contents thereof.

When the evidence adduced to show that a testator was mentally incompetent at the time of the execution of the will is ruled by the Court to be insufficient as matter of law to authorize the jury to infer from it lack of testamentary capacity, then a hypothetical question embodying this evidence cannot be put to a medical expert for the purpose of showing that in his opinion these facts do indicate mental incapacity.

Appeal from the Superior Court of Baltimore City (STOCKBRIDGE, J.)

The cause was argued before MCSHERRY, C. J., BRISCOE, PAGE, BOYD, SCHMUCKER, JONES and BURKE, JJ.

*S. S. Field*, for the appellants.

*Charles E. Fink*, for the appellees.

JONES, J., delivered the opinion of the Court.

This is an appeal from rulings of the Superior Court of Baltimore City in a trial of issues involving the validity of the will of John Zehner, late of Carroll County, deceased. The rulings here under review were made in a second trial of these same issues. Those made in the first trial were before this Court in the case of *Gesell* v. *Baugher*, 100 Md. 677, and the views which controlled the decision in that case will largely influence the decision of this. These issues are four in number. The first is whether the purporting will of the said testator "was signed by the said John Zehner or some other person in his presence, and by his express direction or attested and subscribed in his presence by two or more credible witnesses."

*Second.* Whether said "will executed by the said John Zehner, when he was of sound and disposing mind and capable of making a valid deed or contract."

*Third.* "Whether the said John Zehner at the time of the execution of said paper-writing knew the contents thereof."

*Fourth.* "Whether the execution of said paper-writing was procured by undue influence," &c.

The record brings up two exceptions. The first is to the refusal of the trial Court to allow a hypothetical question propounded to a witness who was called as an expert; and the second is to the action of the Court upon the instructions to the jury. Of these there were four—each issue being made the subject of a specific instruction. As to the first issue the jury were instructed "that by the uncontradicted evidence in this case" the purporting will was signed by the said John Zehner in the presence of two credible witnesses, and attested, by the said witnesses in his presence and that therefore the verdict of the jury must be for the defendants on the first issue, and their answer to the same should be "Yes." As to each of the other issues the Court instructed that there was no legally sufficient evidence in the case to sustain it; and that upon the verdict of the jury must be for the defendants (appellees.) The questions raised by the second exception will be considered first. No objection has been urged to the instruction given as to the fourth issue and as it is very clear from the record that none could be with any basis of support, that need not be further noticed.

It is insisted there is error in the instruction respecting the first issue in that the Court, instead of affirming that the finding of the jury must be for the defendants upon the uncontradicted evidence of the facts therein indicated, should have left it to the jury to find such facts and to render their verdict for the defendants upon the hypothesis of such facts being so found. It may be conceded that the more appropriate form of instruction as to the issue under consideration would have been the one indicated in this contention of the appellants, yet under the circumstances here and upon the evidence we can-

not hold that there is reversible error in the instruction as granted. The jury could by no possibility, upon any rational basis, or without arbitrary disregard of plain, direct and unequivocal evidence have made a finding upon the issue in question contrary to that which the instruction under consideration required. The only testimony in the record in reference to the inquiry involved in the first issue is that given by the subscribing witnesses to the will in question, Mr. Miller and Dr. Billingslea. This testimony is upon the part of Mr. Miller that he signed the will as a witness "in the presence of Mr. Zehner and of Dr. Billingslea," and that he and Dr. Billingslea signed as witnesses "in the presence of each other and in the presence of John Zehner;" and upon cross-examination upon being asked how long Dr. Billingslea was in the room, in which the will was signed and witnessed, answered, "he was in there long enough to see Mr. Zehner sign his name and to sign his name and to see me sign my name." When asked how he and Dr. Billingslea happened to sign the paper he said "Mr. Zehner asked us to sign it." Dr. Billingslea testified, "I signed it (the will in question) in the presence of Mr. Zehner and Mr. Geo. A. Miller." He further said that Mr. Miller had come to him in a room adjoining that in which the signing was done and said to him "that Mr. Zehner wanted me (him) to witness his will;" and that when he (the witness) went into the room in which he signed the paper Mr. Miller said to him in the presence of Mr. Zehner that "Mr. Zehner wanted me to witness his will." With nothing to contradict or discredit this testimony there was but one rational finding for the jury to render on the first issue and this was the one rendered under the instruction of the Court.

The testimony adduced in the case has principal reference to the inquiry as to the testamentary capacity of the testator involved in the second issue. Dr. Billingslea, after testifying to the *factum* of the will, was called as a witness by the caveators as to this inquiry, and his testimony is much relied upon to sustain the contention that the Court below erred in the instruction to the jury upon the evidence relating to the sec-

ond issue.   The testimony has therefore required careful ex-
amination.   Dr. Billingslea attended the testator in his last
illness beginning his attentions on the 4th of April, 1902.  On
the 17th of April the will in question was executed and the
testator died May 19th, 1902.   Dr. Billingslea testified that
the testator first consulted him professionally on the 4th of
April, 1902, when he came to his office early in the morning
and called him out of bed; that he then "found him (the tes-
tator) in a very serious condition, he was dropsical and very
short of breath, he had a complication of troubles rendering
him exceedingly uncomfortable;" that the testator came to
his office several times after this first visit, the last visit being
May 1st; that he then visited him several times at his (testator's)
house prior to May 14th when he brought testator to Balti-
more to a hospital; that upon his (testator's) first call at wit-
ness' office he saw little or nothing that called witness' atten-
tion to his mental condition specially, "although of course like
all men that are very ill when suffering when it is acute shows
mentally and showed he was suffering physically as well as
mentally but I (he) did not at that time consider him in a con-
dition that he was not competent to understand what he was
doing;" that was the first thing that attracted witness' atten-
tion to testator's mental condition was when he came to wit-
ness's office upon "a right cold morning in April or May" wit-
ness "noticed his hands were exceedingly cold" and "he was fee-
ble" and witness asked him if he had had breakfast "and he said
no"—witness then said to him "you certainly ought to have
a cup of coffee" and testator said "no, those people (meaning
the people with whom he was living) would poison me;" that
he could not fix the date of this occurrence, but that it could
not have been later than May 1st; that testator "got worse all
the time, his breathing became more difficult and his ability to
get about, he was decidedly uncomfortable all the time;" and
"as his disease got worse—he became exceedingly dull, you
couldn't reason with him, you couldn't get him to take his
medicine" though witness "explained to him if he didn't take
medicine to act upon his kidneys his dropsy would get worse

and he would certainly be very sick, but he shook his head and spoke about his head being so 'doom.' "

In answer to the question "In your opinion as a physician what was the cause of his (testator's) mental unsoundness?" the witness said, "I think it was due to the interstitial inflammation of the kidneys, probably bringing on what we call edema of the lungs, in which there is great difficulty of breathing, the blood is not properly aerated and that affects the brain. You may talk to them, you may ask questions and they will often answer you intelligently, and the moment you stop talking to them they become dull or they may ramble or think they are not at home or they are not in their room. I have seen that in a number of similar cases and I haven't any question that that was the trouble with Mr. Zehner. I don't believe that Mr. Zehner was crazy in the sense the average person would understand it, I think he was only so because of his physical condition, the disease of his kidneys and heart and the other organs that were necessarily affected." The witness then upon being asked whether in his opinion the testator was of sound and disposing mind and capable of executing a valid deed or contract at the time he executed the will here in question answered, "I don't think he was." Then being asked "You have said this mental unsoundness was caused, in your opinion, by his disease, what was the character of that mental unsoundness with regard to its duration, was it temporary or permanent and progressive," he said, "well of course it was progressive but it was not permanent, what I mean by permanent is at times he would appear rational and answer questions intelligently, but when left to himself he would be in a dull, stupid condition so that he would hardly know what he was about, he was not certainly in an intelligent condition though he could answer, but could not answer anything that required thought or memory." On cross-examination this witness was asked, "Did not you testify in the trial in this case before that on the day the will was made you say yea nor nay whether he (testator) was of sound mind that day?" and answered "If I had to make my testimony upon

what I saw of him that day, just for that short interval, that would be my testimony today." Again being asked "Didn't you say in that case you could not say he was insane that day?" answered, "I say so now from the short interview I had," and again, "Didn't you say on that day you thought he was?" and answered, "No sir, no sir, I never said that, I have no recollection at least of it, I said as far as I could observe that day in the short interval I didn't think there was, he didn't show any evidence of any real trouble, any active trouble at least." Again, "you had no suspicions of any trouble that day?" Answer, "No sir, my attention was not called to anything that time."

The witness had stated that prior to being called upon by the testator on the 4th of April he had had only a speaking acquaintance with him and had, before that, had no conversation with the testator, and he was asked further in the cross-examination whether under such circumstances after having seen the testator, as he testified, only on the 4th, 10th and 16th of April, he was willing to swear that he was, on the 17th of April, "of unsound mind, so he could not make a contract," and answered, "I would swear it was, that suffering the same way, that the same disease he had from the very first visit he paid me, dropsical, panting for his breath and just in the condition I have heretofore described, I don't believe he was in condition to make a valid deed or instrument, especially when that was followed in a few days by decided evidence of mental aberration." The witness was then asked "When you witnessed that will that day did you believe him at that time of unsound mind or not?" and said, "I never gave the question a thought, I was called in hurriedly." And was further asked "If you were or had you any idea that he was of unsound mind would you have signed that will?" and said, "No sir, if I believed that I would not have signed it of course."

All of the testimony of this witness which, it is believed, can bear upon the question under consideration has been set out because the question is one of importance and delicacy in

the case and the testimony referred to is important to its decision. Before adverting to other evidence contained in the record the testimony so set out will be considered to determine whether, as respects that, the trial Court was right in ruling that it was not legally sufficient to be submitted to the jury for a finding of a want of testamentary capacity in responding to the second issue. The want of testamentary capacity must, when urged as a ground for the invalidity of a testamentary act in a given case, relate to the time of the act. Unless want of capacity, permanent in character be established by proof as existing at a time prior to the act, called in question, the presumption of capacity attends the act, and must be overcome by evidence that affords a rational basis for an inference of the want of it at the very time of the execution of such act. 100 Md. 682, 687, *supra*, and cases there cited.

The question for the jury here, therefore under this second issue, was capacity *vel non* of this testator to make a will on the 17th day of April, 1902. Whatever may have been his condition, as to testamentary capacity, at another time, if evidence offered to attack this afforded no rational basis for an inference of the absence of such capacity on that day, and when he was engaged in the execution of the will in question, there was no error in excluding it from the consideration of the jury. Dr. Billingslea, whose testimony is now under consideration, as a witness for the caveators, testified wholly from a professional standpoint as the attending physician of the testator in his last illness. The effect of his testimony was this, that he found the testator affected with the disease which he described. He did not pretend that the mere fact of his having this disease of itself deprived him, at any and every stage thereof, of the mental capacity to make a will; but testified that the disease was progressive; and would bring on in the person affected by it the condition which he described at length; and that conditions would result from the disease in its progress which would so far affect the mental capacity of the sufferer as to make him incapable of the intelligent action necessary in making a will. Assuming that the disease in question will pro-

duce the effects ascribed to it by the witness; and that the testator was, in the course of the disease with him overtaken with the conditions that deprived him of testamentary capacity it will remain to connect the condition with the time of the execution of his will, and show that it then existed.    Now the condition, which the doctor described as one that might or would result from the disease, and which, when it came on would produce mental incapacity, had not overtaken the testator on the 4th of April when the doctor first saw him professionally because the doctor says in his testimony "upon his first call at my office I saw little or nothing that called my attention to his mental condition specially   *   *   *   I did not at that time consider him in a condition that he was not competent to understand what he was doing."    Between the 4th of April and the date of the execution of the will the witness saw the testator several times, but he gives no evidence going to fix mental unsoundness upon the testator to the extent of rendering him incapable of the testamentary act at any time during this intervening period.    He mentioned in his testimony the incident of the testator saying "those people would poison" him; but the value of that as evidence in this connection need not be considered here because it was not fixed as having occurred prior to the date of the will.    The first period of time at which the doctor's testimony would fix testamentary incapacity upon the testator is the date of the execution of the will and this would be by the opinion expressed by him in the course of testifying as has been shown.    It is to be observed that the witness did not undertake to describe and define just what the mental condition of the testator was at the time; nor any immediate and characteristic manifestations of it; but only expressed an opinion of his incapacity in the general way that has been indicated.            -

In connection with the execution of the will it appears in evidence that the testator had previously requested Mr. George A. Miller to prepare a will for him; that on the 17th day of April, 1902, he went from his home to the County Clerk's office where Mr. Miller was employed and asked the latter if

he "had that paper ready," and being answered "yes," proceeded at once about executing it—asking Mr. Miller to sign as a witness, and asking him to call in Dr. Billingslea "as he wanted the doctor to be one of the witnesses." Here the testator showed intelligent purpose, and intelligent pursuit of it, showed continuity of purpose, showed will power, showed memory and showed a comprehension of what he was about: And in this immediate connection there is not a particle of testimony going to show anything to the contrary. Dr. Billingslea was with, and saw, the testator at the time and testified in reference to the transaction. His testimony has already been given and need not now be repeated. It is sufficient to say that it shows that the testator in going through the transaction in question exhibited nothing in what he said, in what he did, in his manner or in his appearance that to the trained perceptions of his attending physician, under whose professional care he had been for the previous two weeks, and who had seen him several times professionally within that time to indicate a mental unsoundness that would incapacitate him for the act he was engaged in. He must therefore have exhibited himself, as respects the transaction, as a normal man would. All of this evidence accords with and supports the presumption of testamentary capacity which the caveators are bound to overcome. As respects this witness, the only evidence offered to gratify the burden of proof upon them is the opinion of the witness expressed as heretofore appears, that the testator was not capable of the execution of the testamentary act in question. This opinion seems to have been based upon inferences drawn from conditions exhibited by the testator subsequent to the act. Sincere and conscientious as the opinion was upon the part of the witness, it appears from his own testimony that it was so far opposed to his actual observation of the testator up to and at the time of the testamentary act as to entirely neutralize it as a basis of a conclusion by the jury of a want of testamentary capacity at the date of the will.

As to other evidence in the present record offered in respect to the second issue little need be said. It is in sub-

stance and effect the same as was before this Court in the case in 100 Md. *supra*, and there held not to be legally sufficient for submission to the jury. It is argued that as respects this evidence, or at least some of it, it is before the Court now in a different attitude from what it presented in the case just referred to because the trial Court in the present case allowed, against the objections of the caveatees, the non-expert witnesses to express opinions as to the mental capacity of the testator based upon the evidence in question and there was inconsistency between such rulings and the final ruling that the evidence was not legally sufficient to be submitted to the jury. The rulings of the trial Court in admitting opinions that are thus criticised are not before us in such a way as to require us to pass upon their propriety, and we express no opinion upon such a question. It is enough to say there is no reversible error in the final action of the trial Court as respects the evidence here referred to because that ruling is in accord with that of this Court in respect to the same evidence in the case in 100 Md. *supra*. The effect of the ruling in this case in the Court below worked no injury to the caveators since they were not entitled to have the evidence in question submitted to the jury and, under the circumstances here at least, the time or mode of its exclusion is not material.

There is little difficulty in disposing of the question as to the propriety of the ruling of the trial Court in respect to the evidence as affecting the third issue. Most of the criticism of this ruling was based upon what was claimed to be the effect of the fact, appearing in evidence that the testator could not read nor write, more than to write his name, upon the legal presumption arising from the signing and execution of the will. In the facts of this case we need not stop to consider the effects of the legal presumption referred to. It has been seen that the testator must be taken as having had testamentary capacity. With the capacity to make a will and to determine upon and direct its provisions the facts in evidence in connection with the execution of the will here leave no doubt that the testator knew the contents as matter of fact. He had requested Mr.

Miller to prepare a will for him.   When he went to execute it
he asked Mr. Miller if he "had *that paper* ready."   Miller said
he (the testator) knew what the paper was that he executed.
It is not to be supposed that Miller meant by this that the tes-
tator knew merely that the paper was called a will.   The plain
intendment is that the testator knew that it was a paper carry-
ing out the directions he had given for writing his will.   If he
did not know this under the circumstances it would be be-
cause a fraud was practiced upon him.   This is not to be pre-
sumed.   It was incumbent upon the caveators to show it.
Plainly the evidence affecting the inquiry in the third issue
affords no warrant for an inference that the testator did not
know the contents of the paper offered for probate as his will.
The appellants therefore sustained no injury from the ruling of
the trial Court in respect to the third issue, and it is not ma-
terial to advert to their criticism of the form of instruction
given.

There was no error in the ruling in the first exception.   The
hypothetical question which the Court refused to allow began
as follows: "Suppose that John Zehner was a man of violent
temper especially when drinking; that during the greater por-
tion of his life after reaching manhood, he drank a great deal
of intoxicating beverage, but did not drink any during the
last few months of his life; that prior to and on April 4th,
1902, he was suffering greatly from interstitial inflammation of
the kidneys, dilation of the heart, edema of the lungs and drop-
sical, and that these diseases had reached the stage when it was
apparent to a physician, that John Zehner had not long to
live; that he constantly grew worse until his death on May
19th, 1902, from said diseases;" and then went on to recite
the other facts and incidents which had been offered in evi-
dence as tending to show testamentary incapacity in the tes-
tator at the time of making his will; and concluded as follows:
"Supposing all these facts to be true, state whether or not in
your opinion, John Zehner was of sound and disposing mind
and capable of making a valid deed or contract on April 17th,
1902, one month and two days before his death."   The hy-

pothetical question thus put it to the witness to determine, as far as his evidence could do so, the inquiry which the jury was to make under the second issue; and in so doing this recited as the basis of the opinion he was to give the evidence which the caveators had offered to the jury as tending to show testamentary incapacity in the testator at the time of the execution of the will in controversy; and which evidence the Court ruled was legally insufficient to be submitted to the jury for such purpose. The witness was no more competent to pass upon the evidence as affecting the inquiry involved than the Court and the jury. This brings the question presented under this exception within the ruling in *Berry Will case,* 96 Md. 45.

It is sought to distinguish the ruling here from that in the case just referred to in that the question here makes reference to the fact of the testator being affected with the disease before and at the time of the execution of the will. The distinction however is not sound. The inquiry under the second issue was whether the testator was possessed of the testamentary capacity which is required and defined in our statute, *Davis* v. *Calvert,* 5 Gill & John, 269 (marg. Brantley's ed.). *Berry Will case, supra.* That he was affected with disease and the effect the disease may have had upon him at the time he executed his will were among the facts to be taken into consideration by the jury in determining whether his condition was such at the time as to show this prescribed capacity. The medical expert can enlighten the jury as to the nature of a disease, its probable effect, and the manifestations thereof under given circumstances; but it is for the jury to say whether the effect is present at the particular time involved in the inquiry and whether in connection with other facts it shows a condition that incapacitates the testator in the given case. The hypothetical question here suggested nothing that could enlighten the jury as to the nature of the disease in question or as to how or to what extent, in its course, it would affect the mind. It merely noted the fact of the disease and the physical effects of it manifested on the 4th of April, 1902.

The question presented nothing that required the peculiar skill and knowledge of an expert to answer, and withal, would, if the opinion of the witness should have been adopted by the jury, have excluded from their consideration all of the facts, which have been heretofore noticed, having immediate connection with the execution of the will.   Without pursuing the inquiry further sufficient has been said to show that the ruling now in question must with others heretofore considered be affirmed.

*Rulings affirmed.*

(Decided June 14th, 1906.)