MOLLIE E. BELL ET AL. *v.* JOHN B. WOLFKILL ET AL., EXECUTORS.

*Testamentary Capacity — Temporary Abnormalities — Undue Influence—Evidence.*

A want of testamentary capacity, if temporary in character, is not sufficient to invalidate the will, unless shown to exist at the time of its execution.                    pp. 415, 416

The law presumes every person to be sane and to possess the requisite capacity to make a valid will, and evidence to overthrow this presumption must show that at the date of the execution of the will the testatrix was incapable of making a valid deed or contract.                    p. 416

Testatrix' omission to make children of a deceased daughter beneficiaries under her will is not sufficient of itself to carry the case to the jury on the issue of testamentary capacity.

p. 416

Evidence that testatrix had spoken of the disposition of her daughter and son-in-law to control her actions in various domestic matters, and that they had prevented occasional small kindnesses and gifts by her to caveators, was not sufficient to carry the case to the jury on the issue of undue influence in the procurement of the will.    p. 417

Mere conjecture, or a suspicious circumstance, or even an influence or constraint, if not directly connected with the will as its procuring cause, is not sufficient to invalidate the will for undue influence.    p. 417

Where lack of mental capacity on the part of testatrix was shown to be temporary merely, it was proper to exclude questions asking witnesses' opinions of her capacity, which were not directed to her capacity on the day of the execution of the alleged will.    p. 418

*Decided March 3rd, 1927.*

Appeal from the Circuit Court for Washington County (WAGAMAN, J.).

Caveat proceedings by Mollie E. Bell, Cora W. Hiller, and J. Harris Sagle and Donald Sagle, by their father and next friend, J. W. Sagle, as regards the alleged will of Emma J. Welfkill, deceased, defended by John B. Wolfkill and Harry R. Miller, executors named in said alleged will. From rulings in favor of the caveatees, the caveators appeal. Affirmed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*Leon R. Yourtee,* with whom was *William H. Bovey* on the brief, for the appellants.

*Oswald & Oswald,* submitting on brief, for the appellees.

PATTISON, J., delivered the opinion of the Court.

Emma J. Wolfkill died on January 22, 1926, seised and possessed of certain real and personal property, and leaving surviving her two sons, John B. Wolfkill and Albert J. Wolfkill, and three daughters, Bessie B. Miller, Cora W. Hiller, and Mollie E. Bell, and two grandsons, J. Harris Sagle and Donald Sagle, sons of a deceased daughter, Lola P. Sagle.

On the 19th day of November, 1925, she executed a paper writing purporting to be her last will and testament, by which she, after providing for the payment of her just debts and funeral expenses, devised and bequeathed the whole of her estate real and personal as follows, to wit:

"To my son, John B. Wolfkill, $2,000. To my son Albert J. Wolfkill, $1,500. To my daughter, Bessie B. Miller, $2,500. To my daughter, Mollie E. Bell, $750, which said sum of $750 shall be a charge against the distributive share hereinafter devised to my daughter, Cora W. Hiller. To my grandson, Norman Guy Wolfkill, son of Albert J. Wolfkill, $1,000. To my granddaughter, Nellie E. Wolfkill, daughter of John B. Wolfkill, in appreciation of the care exercised over me, for the attention given me and for the great kindness displayed toward me, $500. All the rest and residue of my estate left remaining after the devises hereinbefore mentioned shall be divided equally among my five children share and share alike and should any of my children be deceased at the time of my death and leave surviving them any child or children, then I will and direct that such child or children so surviving any child of mine so deceased as aforesaid, shall take the share or respective share such child of mine if living would have taken.

"2nd. I will and direct that the distributive shares hereinbefore devised to my daughters, Cora W. Hiller and Mollie E. Bell shall be held in trust for the use and benefit of the said Cora W. Hiller and Mollie E. Bell during their natural lives, the income of which shall be paid to them annually, and upon the death of the said Cora W. Hiller, then the entire estate so de-

vised to her as hereinbefore mentioned, shall be divided among her children share and share alike, and should any child or children of the said Cora W. Hiller be deceased at the time of the death of the said Cora W. Hiller and leave surviving them any child or children, then I will and direct that such child or children so surviving shall take the share or respective share of such parent or parents, if living, would have taken, and upon the death of the said Mollie E. Bell I will and direct that the entire estate so devised to her as hereinbefore mentioned, shall revert to my estate and be distributed to my children share and share alike as provided for the distribution of my original estate.

"3rd. I hereby constitute, nominate and appoint my son, John B. Wolfkill, and my son-in-law, Harry R. Miller, to be the executors of this my last will, with full power and authority to sell and convey the whole of my estate of a saleable nature and reduce the same to cash and make distribution of the proceeds as hereinbefore directed, and I further will and direct that they be excused from giving any other bond than that which is required by law."

The alleged will was, on the 23rd day of February, 1926, admitted to probate by the Orphans' Court of Washington County.

On the 13th day of April, 1926, Mollie E. Bell, Cora W. Hiller, and J. Harris Sagle and Donald Sagle, by their father and next friend, J. W. Sagle, filed a caveat to said will, which resulted in five issues being framed and sent to the Circuit Court for Washington County for trial. These issues were: (1) Knowledge and understanding of the contents of the will: (2) the *factum* of the will; (3) mental capacity; (4) undue influence; and (5) fraud.

The executors of the will, John B. Wolfkill and Harry R. Miller, were made party defendants to the proceedings.

At the conclusion of the caveators' evidence, the court granted the third, fourth and fifth prayers of the caveatees, and for their first and second prayers, it substituted two

instructions of its own, which are designated as caveatees' first and second prayers. By the caveatees' third prayer, the jury was instructed that there was no legally sufficient evidence to sustain the third issue, as to the capacity of the testatrix to make a valid deed or contract, and directed a verdict of "yes" to that issue.

By the fourth prayer, the jury was instructed that there was no legally sufficient evidence to sustain the fourth issue, as to undue influence practiced upon the testatrix, and directed a verdict of "no" to that issue.

By their fifth prayer the jury was instructed that there was no legally sufficient evidence to sustain the fifth issue, as to whether said alleged will was obtained by fraud practiced upon the testatrix, and directed a verdict of "no" to that issue.

By the caveatees' first prayer, the jury was instructed that there was no evidence legally sufficient to show that the testatrix was not of sound and disposing mind and capable of making a valid deed or contract at the time of the execution of the paper writing, purporting to be her last will and testament, and if it found that the said testatrix signed said paper writing, then the presumption was that she knew and understood the contents thereof, and by it they were further instructed that there was no evidence legally sufficient to enable them to find such presumption had been overcome, and it directed a verdict of "yes" to the first issue, as to her knowledge and understanding of the contents of such paper writing.

By their second prayer, the jury was told that if it found from the evidence that the testatrix signed the paper writing purporting to be her last will and testament, in the presence of those designated thereon as witnesses thereto, and that they in her presence subscribed their names as witnesses, then its verdict must be for the caveatees on the second issue, and their answer thereto must be "yes."

The jury, upon the instructions given it by the court, found for the caveatees on each and all of said issues, and it was

to the court's rulings thereon that the fifth bill of exceptions was taken. The other four exceptions relate to rulings of the court in rejecting certain evidence offered by the caveators.

We will first consider the ruling of the court in granting the caveatees' third prayer, by which the jury was told that there was no evidence legally sufficient to sustain the third issue, the one as to the mental capacity of the testatrix to make a valid deed or contract, and by which prayer the question presented by that issue was withdrawn from the consideration of the jury.

The record discloses that the testatrix was, at the time of her death, advanced in years. Her husband had died several years before and, at the time of the execution of the alleged will, she was living at her home with her daughter and son-in-law, Bessie and Harry R. Miller. An earlier will had been executed by the testatrix in June, 1923, the provisions of which differed but little from the will in question, executed two years and five months later. In the first of these wills she gave to her son John the sum of twenty-five hundred dollars. In the last she gave to him two thousand dollars, but gave to her granddaughter Nellie, the daughter of John, who had received nothing by the first will, the sum of five hundred dollars. The reason stated by the testatrix for making this change in the disposition of her estate was that she thought Nellie was entitled to such remembrance because of the services which she had rendered her. In all other respects the will of June, 1923, was the same as the will of November 19th, 1925.

The witnesses produced by the caveators consisted of themselves and members of their immediate family. It is shown from their evidence that the testatrix, through a period of more than thirty years, had at times what the witnesses called "spells," when she would call her daughters and others ugly and vulgar names, indicating that they were guilty of offenses of which the record does not show them to have been guilty, and on such occasions she at times would become angry with them and attempt to do them bodily injury, would threaten to kill them. At other times, however, when nor-

mal, she would treat them all right. It was only while in these spells she treated them in the manner stated. It was said by them that, in talking to one of her children, she would criticize one or more of the others and would speak of them in a way indicating that she did not care for them, and when she would be asked, by those whom she had criticized, to explain what she had said, she would deny it. This they said often produced discord and bad feeling among the different members of the family.

The husband of the testatrix, several years before his death, suffered from some mental derangement and was confined to one of the institutions of the state. It was stated by a number of the witnesses that at times different members of the family would compare the mental condition of the father with that of the mother, saying that she was worse than he was and incapable of transacting any business. Among other things that were said of her was that, on one occasion, Dr. Wertz, her attending physician, brought Dr. Prather out to see her, and in making an examination of her they placed a piece of ice upon her heart, and she said in so doing "they were fools and were trying to make a fool of her"; that in her last spell of sickness, she would only let certain ones give her medicine, these were the Millers and her granddaughter Nellie, though the medicine given was only a teaspoonful of soda in a glass of water.

Mollie Bell, the daughter of the testatrix, one of the caveators, testified that on one occasion, about thirty-two years prior to her mother's death, her mother took one of her brothers and laid him on a pile of laths, and beat him with one of them until she nearly killed him, and that she would have killed him had it not been for the intervention of a colored woman. The witness further testified that her mother would have these "terrible spells", which would last her sometimes a day and other times not so long. She had heard her brother John say that their mother "was crazy just like all the other Stouffers," though she had not talked with him for the last three or four years. That the first time she

heard him use this expression was twenty years ago, though she had heard him say the same thing a number of times since. She, as well as others, testified that the testatrix had at times threatened to kill herself, but never with a gun, that she did "not want to make a hole in herself, it might look bad when she was dead," and at other times she said "they were all trying to poison her." The witness visited her mother on November 17th, 1925, two days before she executed the alleged will. At that time she said her mother repeated very much and it was only with difficulty that she could say what she had to say. She said while she was there her mother took hold of the counterpane and said "it was an old dirty nightgown," and she was not able to convince her otherwise. She then told her that "Harry's hand had been cut," and that he was threatened with blood poison and her mother replied, "I told you, you were all trying to poison me." The testatrix on this occasion was in bed and she did not at first recognize witness, saying she had "shrunk up." The witness was with her from four o'clock until eight-thirty o'clock at night. As stated by the witness, the testatrix on that occasion, in speaking of Dr. Wertz, said "he was the biggest liar that ever lived. He promised to be out when the blue birds were singing," and that he did not know what was wrong with her any more than she did.

Harris Sagle, as well as his wife, visited the testatrix on the eighteenth day of November, the day after the visit of his Aunt Mollie, and the day before the alleged will was executed. On this occasion, they said, the testatrix told them that there was "no room on earth for her any more; she had to get off; she had to die." They both said that she had difficulty in expressing herself. She would start to say something, would not get very far and stop. They both testified that in their conversation with her, on the occasion mentioned, Harris asked her to give to him the sword of her husband, his grandfather, which it seems he had previously asked his grandfather to give to him. In reply to his request she told him that when he came again she would give him an answer,

as she first had to see Harry Miller. A few days afterwards he again visited his grandmother, and she told him she could not give it to him, as Harry Miller wanted it. In addition to this the testatrix spoke of an oak bedstead in the attic that she would give to him, but Harris afterwards learned that Harry Miller would not consent for her to do so.

No witness was produced who saw the testatrix on the day she executed the will, except Dr. Wertz, the attending physician, and Edward M. Tenney, the draftsman of the will, who were witnesses to it. Dr. Wertz and Mr. Tenney both testified that the testatrix at the time of executing said alleged will was of sound and disposing memory and understanding.

Mr. Tenney, who drew the alleged will, testifying in reply to a question asked him by the caveators in regard to the instruction given to him by the testatrix as to how she wished the will drawn, stated that "she said there were just two changes that she wanted made in that will; otherwise just the same as the first will I had written for her"; that in neither the first nor the second will was there any bequest to either Harris or Donald Sagle, nor did he then know of their existence. The two changes she asked to be made were the two that we have mentioned.

It was upon the acts and expressions of the testatrix, and her failure to include Harris and Donald Sagle as beneficiaires in her will, that the court below was asked to submit to the jury the issue whether or not the testatrix, at the time of executing the alleged will, was of sound and disposing memory and understanding, and capable of making a valid deed or contract. Such acts and expressions of the testatrix indicating, as claimed, a want of mentality sufficient to enable her to make a valid deed or contract, were in the most part admittedly done and said at times when she was in an alleged temporary abnormal mental condition, described as "spells" by the witnesses. At other times, as disclosed by the record, she was in a normal mental condition. If the evidence offered by the caveators can be said to indicate a condition of mentality tending to show that the testatrix was in-

capable of making a valid deed or contract at such times, such condition was not permanent. "The want of testamentary capacity must, when urged as a ground for the invalidity of a testamentary act in a given case, relate to the time of the act. Unless want of capacity, permanent in character, be established by proof as existing at a time prior to the act, called in question, the presumption of capacity attends the act, and must be overcome by evidence that affords a rational basis for an inference of the want of it at the very time of the execution of such act." *Baugher v. Gesell,* 103 Md. 450.

The law presumes every man to be sane and to possess the requisite capacity to make a valid will. *Brown v. Ward,* 53 Md. 382; *Higgins v. Carlton,* 28 Md. 142; *Davis v. Denney,* 94 Md. 392. And before evidence can be held to be legally sufficient to overthrow that presumption, it must be directed *to the date of the execution of the will* and must tend to show that the testatrix was *at that time* incapable of making a valid deed or contract. *Gesell v. Baugher,* 100 Md. 682; *Birchett v. Smith,* 150 Md. 369.

If the testatrix was mentally capable of making a will and was not unduly influenced, she had a perfect right to dispose of her property as she pleased, and the fact that she did not make her grandsons Donald and Harris Sagle beneficiaries thereunder was not sufficient to annul the will. The mere fact that Donald and Harris Sagle, grandsons of the testatrix, were not by her made beneficiaries under her will, would not in itself carry the case to the jury upon the issue whether she was capable of making a valid deed or contract. It would only reflect upon her capacity to execute the will, when such fact was accompanied by other facts tending to show the incapacity of the testatrix. The court, we think, committed no error in granting the caveatees' third prayer, withdrawing the third issue from the consideration of the jury.

The evidence offered in support of the caveators' contention that the will was obtained by undue influence practiced · upon the testatrix was, we think, like that offered in support

of the third issue, properly held to be legally insufficient to
go to the jury.

There was much said by the witnesses of the caveators in
regard to what was told them by the testatrix as to the dis-
position of Harry R. Miller and wife, with whom she lived,
to control her actions in various domestic matters in which
such witnesses were in some way interested or identified.
They also said that she was prevented by the Millers from
doing for them certain unimportant acts of kindness and that
she would have given to them certain articles of small value,
had it not been for the intervention or opposition of the Mil-
lers, all of which, they claimed, showed that she was under
the dominion and control of the Millers. But it is not shown
anywhere in the evidence that Miller and his wife or any
of the other children ever in the slightest way attempted to
influence her in the disposition of her estate.

Mrs. Wolfkill, wishing to change the will she had pre-
viously made in June, 1923, she in November, 1925, sent for
Mr. Tenney, who had drawn the first of these wills, and told
him she wished to make a change in the disposition of her
property by giving five hundred dollars to her granddaughter,
Nellie Wolfkill, who had received nothing in the former
will, in consideration of the kindness and attention shown
by her to the testatrix, and by giving to her son John, the
father of Nellie, five hundred dollars less than she had given
him in the former will. With these directions Mr. Tenney
returned to his home and drew the will, which he some days
afterwards carried to Mrs. Wolfkill, when it was executed
by her. On both of these visits of Tenney to Mrs. Wolfkill,
they were alone, none of the beneficiaries being present.

As was said by Judge Parke, speaking for the Court in
*Malone v. Malone,* 148 Md. 200: "This Court has had this
question of undue influence frequently under consideration,
and it is useless to repeat the requirements of proof to carry
the question to the jury, but mere conjecture, or a suspicious
circumstance, or even an influence or constraint, if not

directly connected with the will in the sense of being its procuring cause, will not be sufficient. The will of a competent person can not be nullified on the ground of undue influence without affirmative evidence of sufficient probative force to carry to a mind the reasonable conviction of its existence, and that it induced the action of the testator."

The fourth prayer withdrawing the case from the jury on the issue of undue influence was likewise properly granted by the court.

With the conclusions we have expressed herein, we find no error in the court's rulings in granting the first, second and fifth prayers.

Mollie Bell, Harris Sagle and Cora Hiller were each asked to give their opinion as to whether or not the testatrix was capable of making a valid deed or contract. The court refused to allow these questions to be asked and answered, and the caveators excepted thereto. These rulings of the court constitute the first, second and fourth exceptions. The witnesses were not asked to give their opinion as to the capacity of the testatrix to make a valid deed and contract on the day of the execution of the alleged will. This omission alone was sufficient to render the question inadmissible upon the facts of this case. We find no error in the court's rulings on these exceptions, nor in its rulings upon the third exception, where the witness Hiller was asked had he ever heard Albert Wolfkill, who is not a party to this suit, speak of the mental capacity of his mother.

As the record discloses no errors committed by the court, its rulings will be affirmed.

*Rulings affirmed.*