W. ALONZA WILLIS ET AL. *v.* THOMAS WILLIS ET AL., EXECUTORS

[No. 28, October Term, 1936.]

146

*Decided November 25th, 1936.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, and JOHNSON, JJ.

*Edward T. Miller* and *T. Hughlett Henry,* with whom was *T. Hughlett Henry, Jr.,* on the brief, for the appellants.

*G. Elbert Marshall* and *William H. Adkins,* for the appellees.

MITCHELL, J., delivered the opinion of the Court.

This is an appeal from rulings of the Orphans' Court of Talbot County, on a caveat to the last will and testament of William Thomas Willis, late of said county.

The testator was nearly eighty-seven years of age at the time of his death, which occurred on November 23rd, 1933. His wife predeceased him, and he was survived by his four children, namely, W. Alonza Willis, Grace White, and Ida Warner, who are the caveators, and Thomas Willis, the latter son, together with Blanche Willis, his wife, and Charles J. Butler, the executor under the will, being the caveatees.

The deceased was engaged as a farmer for the greater part of his life, having retired from active work about sixteen years prior to his death. In 1911 he gave up a farm which he rented, his son, Thomas, taking over the lease, and the father placing his farm equipment with Thomas, and continuing to live with him, under a working agreement between them. This arrangement lasted for a year, at which time the father rented a separate farm, to which he moved a part of his equipment and stock. He remained on the latter farm for a year, later removing to a third property. Subsequently he ceased agricultural pursuits, and was employed at a mill and in other lines of work. In the fall of 1916 he returned to the home of his son Thomas, where he lived continuously until 1930. In September, 1927, the first wife of Thomas died, and, from the date of her death until 1930, the family consisted of Thomas, his two sons, and the old man.

On January 1st, 1930, Thomas was again married, and his second wife took up her abode in the home. She sought to rearrange the affairs of the household, in a manner which did not meet with the approval of her father-in-law, and some disagreement occurred between them. This caused Thomas to interview his brother,

Alonza, whereby an agreement was reached under which the father, on March 19th, 1930, moved to the home of Alonza, remaining there until June 19th, 1931, when he returned to the home of Thomas.

On February 28th, 1931, during the interval in which he was residing with Alonza, the father visited Easton, the county seat of Talbot County, and, in company with Henry Hollyday, filed with James A. Spence, the then register of wills of the county, for safe-keeping, a paper purporting to be his last will and testament. There is nothing in the record to show the contents of the paper so filed, and the ex-register testifies that it was in a sealed envelope when lodged with him. We gather from the record that Mr. Hollyday was the draftsman of the document, and it is shown that he died before the trial below took place.

On June 30th, 1931, a date subsequent to the date of the return of the testator to his former home, according to the testimony of Mr. Spence, Thomas Willis, the son, called at his office, and stated to the register that his father desired to withdraw his will. Upon being advised that the testator should either apply in person, or send a written order for the withdrawal of the paper, Thomas told the register that his father was awaiting his return in a parked car near the court house. Thereupon the register, taking the paper with him, went to where the testator was waiting, and in this connection testified as follows:

"Q. What conversation did you have with Mr. Willis at that time? A. When I went out, I said, Tom said you wanted your will. He said, Oh, I don't know whether I want it or not. He said yes, I do, that's all right, hand it here. He laughed like he was joking. It was a habit of his. That's practically all the conversation I recall now."

He further testified that, between the dates of filing and withdrawing the paper from his office, the testator had not made inquiry about the will, and that it was in the sealed envelope, as originally lodged in his office, when delivered to Mr. Willis.

On the date of withdrawing the paper, the testator, in company with his son, Thomas, and the latter's wife, visited the office of Attorney Charles J. Butler, where, as related by Mr. Butler, the senior Willis told the attorney that he desired to make a will. He then stated that he had a will but wished to change it. When asked about the former will, he handed Mr. Butler the sealed envelope, stating that the will was in it, but the contents were not examined by the attorney, who then proceeded to ask the testator for directions in the preparation of the second will. Mr. Butler testified that he did not recall whether the son and his wife remained in his office while he was taking down data for the preparation of the will, but he did testify that the testator gave him the names of his children and the proportion of his estate he wanted each to receive. The will was then prepared and read to the testator, who stated that it "was exactly the way he wanted it." According to the attorney, the senior Willis then said: "It looks like Tom is getting the most," and I said, "Yes, it certainly does." He said, "Well, that will depend upon how long I live. If I live a long time then Tom will not get any more than the rest of them. I am depending upon him and his wife to tend me and look out for me, that's the reason I am giving it to them both."

Mr. Willis then told Mr. Butler where his money was deposited and that his son Alonza had possession of his bank book. The attorney then called in John C. North and Oliver S. Mullikin, the subscribing witnesses to the will, both of whom testified, as did Mr. Butler, that, at the time of the execution of the second will, the testator was capable of making a valid deed or contract. The witness Mullikin testified that no person, other than the subscribing witnesses, the testator, and Mr. Butler, were present when the will was executed, and the witness North testified that he conversed with Mr. Willis prior to the execution, who told him that he was making a will and that his son Alonza had his bank book and he was afraid he would get his money.

The record shows that the bulk of the estate, or practically all of it, consists of savings bank deposits amounting to $3,208.37 as of January 4th, 1934, and the obligations against it, if any, are not shown. The will, which is brief, bequeaths the estate as follows: To W. Alonza Willis, $100; to each of the two daughters $25; and to Thomas H. Willis and Blanche A. Willis, the daughter-in-law, share and share alike, the rest and residue of the estate.

This will was filed for probate on November 27th, 1933, and, before probate, notice of a caveat thereto was duly filed. The caveat and answer having been regularly filed, subsequent proceedings ensued, whereby the usual issues were framed and ordered to be sent to the Circuit Court for Talbot County, to be tried by a jury. Later, however, a stipulation was filed in the proceedings, agreeing that the issues be heard by the orphans' court, whereupon the order of the court sending the case to the circuit court for trial was rescinded, and the case submitted to the orphans' court.

At the conclusion of the testimony, the court found a verdict for the caveatees on all four of the issues submitted to it, which issues, in substance, were as follows: (a) Mental capacity at the time of the execution of the will; (b) knowledge of its contents, by the testator, at the time of the execution; (c) undue influence practiced upon him, constraining his will; (d) procurement of the will by fraud or duress practiced upon him. Accordingly it passed an order denying the prayer of the petition and caveat, and admitting the will to probate. From that order this appeal is taken.

At the hearing in this court, the questions raised by the first and third issues were the only two stressed by the appellants.

The record is replete with testimony adduced on behalf of the caveators, for the purpose of showing mental incapacity; which testimony, in our opinion, does not mount up to the standard required to meet the burden of proof. The exceptions are based upon rulings of the lower court

upon the evidence, and these rulings will now be considered.

Arthur Gannon was called for the purpose of expressing an opinion as to the mental capacity of the testator. In substance he testified that he was forty-two years of age and had known Mr. Willis ever since he could remember. No details of contact between the witness and the testator were given by Gannon, other than that he saw Mr. Willis on one occasion "during the early summer or in the spring of 1931." The witness then met him in Easton; they visited Denton together, returned to his home, and dined together. He later stated that he did not know what time of the year this meeting took place, but that it was in the spring, some time, and that "maybe we went over to Denton after some chickens." He was asked if he conversed with the testator, and, upon answering in the affirmative, was then asked: (a) What did he notice, if anything, about the keenness of his mind? (b) To describe how Willis acted and talked on the occasion of the trip he took with him in the spring of 1931? (c) The condition of the testator on that occasion? (d) His mode of conversation on that occasion, as compared with his previous knowledge of the testator? To all of these questions, objections were promptly interposed, and sustained. In the absence of any offer of proof to indicate the relation of these questions to the issues involved, it would be impossible to predicate reversible error upon these rulings.

The witness, in the course of his examination, stated that the physical condition of the testator seemed to be all right, and that his eyesight, which will be hereafter referred to, was fair. He had detailed no incident whatever in connection with the testator which would indicate either the want of mental capacity or the possession of any peculiarity, and it must be remembered that he was testifying to facts connected with a casual meeting in the spring of 1931, and that the will was executed on the last day of June, in that year. While mental condition and any peculiarities of a testator may in some

cases be such as to play a part in the procurement of a will by undue influence, even though it is not sufficient to support a finding that the testator in a particular case was not competent to make a will, if left free to do it as he might wish, so far as the testimony of Gannon related to either mental capacity or undue influence, there was no foundation laid which would justify either the questions or answers thereto, and accordingly the rulings were proper. *Mecutchen v. Gigous,* 150 Md. 79, 132 A. 425.

In *Gesell v. Baugher,* 100 Md. 677, 60 A. 481, 482, in considering the legal sufficiency of testimony necessary to set aside a will upon the ground of mental incapacity, it was said:

"In disposing of this part of the case, it is important to bear in mind two fundamental propositions which are especially applicable to it:

"First. The law presumes every man to be sane, and to possess the requisite capacity to make a valid will. *Brown v. Ward,* 53 Md. 382; *Higgins v. Carlton,* 28 Md. 142; *Davis v. Denny,* 94 Md. 392, 50 A. 1037.

"Secondly. Testimony, in order to be legally sufficient to overthrow the presumption in favor of sanity and capacity, must be directed to the date of the execution of the will, and must tend to show that the testator was at that time incapable. For the purpose of shedding light on his condition at that time, but for no other purpose, evidence of his bodily and mental condition both before and afterwards may be produced. *Davis v. Calvert,* 5 G. & J. 300; *Brashears v. Orme,* 93 Md. 447, 49 A. 620. But if the opinion of the witness is desired to prove, not capacity, but incapacity, the question put to him must be such as to limit the inquiry to the date of the making of the will. *Jones v. Collins,* 94 Md. 410, 51 A. 398; *Brashears v. Orme, supra.*"

The second exception to the evidence, stressed by the appellants, was to a granted motion to strike out the answer of W. Alonza Willis, one of the caveators, to a question directed to an alleged indebtedness from Thomas

Willis to his father, amounting to $500, and evidenced by two notes which the witness, Alonza, testified he had seen.

In answer to the query, what was done with these notes, the witness stated that his father wanted to give them to the sheriff several times; that he advised against such action; that he did not know what was done with them; but that later the testator took the notes to Mr. Hollyday, the scrivener of the first will, stating that he had forgotten what was in his will and wanted to have it read over again. The witness further testified that Mr. Hollyday interviewed him, stating that his father had been to see him (Hollyday) several times, and that he had forgotten the contents of the will; that he had the notes and wanted them put with the will; that the witness advised that such was the best course to take because his father might lose them; and that either Hollyday or the testator (the record not being clear as to which), said he was going to take them to Mr. Spence, the then register.

We cannot agree that this testimony, dealing entirely with an alleged indebtedness on the part of the son Thomas to his father, has anything to do with the issues involved in the instant case. About all it tends to show is an intention of the testator to collect a debt from Thomas which was never carried into effect. It is not clear that the witness was present when the testator interviewed Mr. Hollyday, and we cannot assume that he was. On the contrary the inference is that the testimony as to the failure of the testator to remember the contents of his first will was predicated upon what Mr. Hollyday told him. If this was the fact, the testimony, at best was based entirely upon hearsay evidence, and the motion to strike out the answer was properly granted.

Again it is urged that the court was in error in rejecting certain testimony of Thomas J. Faulkner. Mr. Faulkner, the record shows, was clerk of the Circuit Court for Talbot County, in which office Mr. Hollyday was a deputy. They were the subscribing witnesses to the first will. He was asked if he had seen the testator

after the date on which he subscribed to the will, and his reply was that about a month afterwards Mr. Willis came to the clerk's office, and he overheard Mr. Hollyday say to him: "No, I could not draw another will. I do not know whether you know what you want or not," or words to that effect.

A motion to strike out the answer was granted, and we think the ruling was a proper one. The witness was not asked to express an opinion as to mental capacity. What he was stating was merely what may have been the opinion of Mr. Hollyday, without any reason for the statement by Hollyday, and, in any event, at a time and under circumstances which had no connection with the execution of the second will. In other words, it was an expression of doubt in Mr. Hollyday's mind, as to whether the testator knew what changes he wanted to make in his will, rather than a declaration by the testator that he himself did not know what he wanted to do.

Mrs. Alonza Willis testified that in January, 1931, the testator asker her about his quilts, stating that they had been carried to church by her, when as a matter of fact they were then in his room; that on July 4th, 1931, the old man called Blanche Willis, the wife of Thomas, "mother"; that Blanche told her she could hardly wait to tell the funny things the testator was doing; she was then asked: "Q. Mrs. Willis, in May or June, 1931, what did you observe as to Mr. Willis', Sr., manner of speaking? A. Well, he was more like a child than anything else." A motion to strike out the answer as being a matter of opinion as to the mental capacity of the testator, expressed by the witness without reference to the date of the execution of the will, was granted, and this action of the court forms the basis of another exception which is stressed by the appellants in their brief.

In the *Berry Will Case*, 93 Md. 560, 49 A. 401, 409, this form of answer is characterized as "a mere ambiguous and indefinite opinion," conveying no intelligent meaning. Upon the authority of that case, in the absence of any evidence sufficient to form a basis for that con-

clusion, we hold that the motion to strike out the answer was properly granted.

It was testified by Miss Thelma Parker that Dr. Pilchard, who at the time of trial was dead, had treated Mr. Willis on three occasions, the first being March 20th, 1929, the second on May 16th, 1931, and the date of the last treatment not being stated. She further testified that she kept the records in the doctor's office and that the cards in the case showed a diagnosis of a cataract of the left eye. She was further questioned as follows: "Q. This certificate I hold in my hand was found with his records? A. Yes. Q. Who wrote this certificate? A. I wrote it. Q. Under whose direction? A. Dr. Pilchard's." Thereupon counsel for the caveator offered in evidence the original certificate, which he stated was signed by Dr. Philchard, and objection to the admission of the same was sustained. There is nothing in the record to indicate the subject matter to which the certificate related, and, as has been shown, the diagnosis found among the records of the deceased doctor related to a cataract of the eye, and made no reference to the mental capacity of the patient. Clearly, from the record before us, we cannot say that the ruling of the orphans' court was erroneous in this particular.

Another exception relates to the action of the court in permitting a question put to J. Elmer Anthony, a witness produced on behalf of the caveatees for the purpose of sustaining the will. The witness definitely testified that the first time he met Mr. Willis was during the latter part of 1931, or some time subsequent to the date of the execution of the will, and that he saw him several times in 1932, and conversed with him, discussing the depression, crop conditions, and other matters. He was then asked the following question: "What, if anything, did you observe in anything that Mr. Willis said or did on the occasion of which you have spoken, indicating any lack of understanding on his part?"

The court overruled an objection to this question, and the witness answered: "I never observed any particulars at all in Mr. Willis. He seemed to talk all right to me."

The question was doubtless intended for the purpose of shedding light upon the state of mind of the testator at the time of the execution of the will, and, as has been shown, for such purpose, this form of testimony may be invoked. *Gesell v. Baugher, supra; Brashears v. Orme,* 93 Md. 442, 447, 49 A. 620; *Davis v. Calvert,* 5 G. & J. 269, 300; *Jones v. Collins,* 94 Md. 403, 410, 51 A. 398.

In *Clary's Admrs. v. Clary,* 24 N. C. (2 Ired.) 78, it is said: "Judgment founded on actual observation of the capacity, disposition [traits of character of the person under consideration] is more than mere opinion. It approaches knowledge, and is knowledge, so far as the imperfection of human nature will permit knowledge of these things to be acquired."

And in *Townshend v. Townshend,* 7 Gill, 10, 28, it is stated: "The impression made upon the mind of the witness by the conduct, manner, bearing, conversation, appearance, and acts of the testator in various business transactions, for a long series of years, is not mere opinion, it is knowledge." Commencing upon this type of testimony, Chief Judge McSherry, in the *Berry Will Case, supra,* said: "Hence, if that basis [of knowledge] is trivial, or insufficient, * * * the witness should not be permitted to express any conclusion at all."

In the instant case, it is hardly necessary to comment further in reaching the conclusion that the witness Anthony, who did not know the testator until some time after the will was executed, who only saw him at intervals and never had any business transactions with him, was not capable of expressing an opinion which would shed light upon the mental capacity of the testator as of the date of the will. The authorities are in accord to the effect that testimony of this character should be carefully guarded, and we are of the opinion that the court was in error in this particular ruling, and that the objection to the question should have been sustained. We cannot conclude, however, that the answer made by the witness, under the circumstances, has sufficient probative force to make the ruling a reversible one.

At the expense of prolonging this opinion, we have considered at length all exceptions stressed in the brief of the appellants, and, in doing so, it has been necessary to review the more important testimony in the case.

In brief, the remaining testimony produced by the caveators consists of their own opinions as to the mental incapacity of William Thomas Willis, based, in most cases, upon incidents tending to show absent-mindedness, and weak physical condition; and further tending to show a fixed intention on his part to divide his small fortune equally among his children. This testimony is corroborated by apparently disinterested witnesses, who relate details of forgetfulness, and more or less trivial instances occurring in the latter part of the old man's life. There is nothing to show undue influence practiced upon the testator by his son, Thomas, except declarations coming from those who either directly, or indirectly, would profit by the annulment of the will; unless it be the fact that Thomas and Blanche Willis, his wife, accompanied the testator to Easton on the date of the execution of the second will, and the withdrawal of the first will from the office of the register of wills. Against that occurrence, however, is the unqualified testimony of Mr. Butler that the testator alone gave him the directions for the preparation of the will, that it was read to Mr. Willis, and that he approved it. And the testimony of the subscribing witnesses that he signed it freely, and out of the presence of either his son Thomas or his wife.

It must be remembered that the greater part of the last years of the testator's life was spent with his son Thomas. The latter had two young boys, of whom he was fond. When Thomas remarried, he became dissatisfied with the new housekeeper in the home. There is nothing to show that Thomas sought to prevail upon him to remain at the home any longer. To the contrary, he saw his brother Alonza and readily agreed that his father go to live with the latter. It was while there that the first will was executed and that Alonza took possession of his savings bank books, and withheld them until after his father's death. It was this incident, at least, that

the testator remembered at the time he signed his second will. He then expressed his desire that Thomas and his wife reap the benefit of his fortune, because he expected them to take care of him, in any event, so long as he should live.

Under these circumstances, much stress is laid upon alleged declarations of the testator of an intent to divide his property equally among his four children, and it is urged that he did not do so because of the undue influence practiced upon him by Thomas and his wife.

In this connection it seems unnecessary to prolong this opinion further than to refer again to the *Berry Will Case, supra,* wherein it is stated: "The tendency to assail last wills upon the ground of mental incapacity, and by frivolous and inconclusive evidence, chiefly of a speculative character, whenever the testator has not disposed of his property in a way to suit disappointed, and, often, distant and distasteful, relations, has grown to such alarming proportions in late years that the courts should be resolute in adhering to the old and long settled principles of the law respecting the admissibility of evidence, allowing no relaxation or refined modifications of them in this class of cases, if last wills and testaments are to be at all upheld by juries." And to also refer to the case of *Saxton v. Krumm,* 107 Md. 393, 68 A. 1056, wherein it is said: "It would be a great inconsistency and absurdity to accord to a testator the power to dispose of his estate in any way he may think proper, consistent with the settled principles of the law, and at the same time say that his will may be annulled if it appears that its disposition is unjust, inequitable, or unaccountable. The effect of such a principle would be the practical denial of the free right of testamentary power in a very large class of cases."

Holding the opinion that no reversible error is found in the rulings of the orphans' court, the order appealed from will be affirmed.

*Order affirmed, with costs to the appellees.*