ARBOGAST, Executor *v.* MacMILLAN et al.

[No. 130, September Term, 1959.]

*Decided February 23, 1960.*

518

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*John M. Robb*, with whom was *Peter J. Carpenti* on the brief, for the appellant.

*Harry I. Stegmaier* and *William L. Wilson* for the appellees.

HORNEY, J., delivered the opinion of the Court.

In this caveat proceeding the appellant, John L. Arbogast, individually and as executor of the estate of George L. Arbogast, deceased, was the caveatee or defendant below, and Cleona MacMillan, Virginia Finn and George Ross Arbogast were the caveators or plaintiffs. Three issues pertaining to the last will and testament of the deceased—the factum of the will, undue influence and mental capacity—were framed by the Orphans Court of Allegany County and sent to the Circuit Court for Allegany County for trial by a jury. At the trial the lower court directed a verdict for the caveatee as to the factum of the will but refused to grant motions for directed verdicts in favor of the caveatee on the issues of undue influence and mental capacity, at the close of the caveators' case, and again at the conclusion of the whole case. The verdicts of the jury on both of the issues submitted to it were in favor of the caveators to the effect that the will was procured by undue influence and that the testator lacked mental capacity

to make a will. When the motions of the caveatee for a judgment *n.o.v.*, or, in the alternative, for a new trial, were overruled by the trial court, the caveatee appealed from the verdicts which had been allowed to stand.

After the death of his second wife on June 13, 1956, the testator continued to live in his home on Crawford Street in Cumberland. Shortly thereafter, when the testator stated to a friend [James G. Stevenson] that he wanted his son [John, the caveatee] to have the home at his death, the friend suggested that the testator should make a will, whereupon he went alone to the office of his attorney [Estel C. Kelley] where the will was drawn and executed in July of 1956, and, later, was deposited in the office of the Register of Wills for safekeeping.

On January 1, 1957, at the request of the testator, the caveatee and his wife moved into the home of the testator in order to take care of him. Soon thereafter, the State Roads Commission took the Crawford Street property for highway use and the testator bought a home on South Street, where the three of them resumed living together. The testator took the upstairs for his quarters and the caveatee and his wife occupied the downstairs. The testator usually ate downstairs, but, at his request, his meals would be taken to him, or, if he wanted to do so, he prepared something to eat in his apartment kitchen. The caveatee and his wife claim that they looked after the needs of the testator and took care of his business affairs, and that he came and went as he wished. That they took proper care of his physical needs was disputed by the caveators, who claim that the testator was neglected and mistreated, and that one of the caveators [Cleona] had to look after him and see that he was properly fed.

On April 25, 1958, the testator became ill and was sent to the hospital by his family doctor, who referred the patient to an urologist [Dr. Howard L. Tolson]. He left the hospital on June 5, 1958, with an inlying catheter and was instructed to return every two weeks for further treatments and to have the catheter changed, but he neglected or refused to do so. Although he had a number of urinary and arterial diseases or abnormal conditions, commonly called kidney trouble

and hardening of the arteries, he was not, however, completely incapacitated.

From July 9 to 21, 1958, the testator was hospitalized again. Thereafter he was seen by the urologist as an outpatient at the hospital on August 6, 1958, and possibly again in October of 1958, but the testator did not thereafter visit the hospital as an outpatient. But during December of 1958 and the first part of January in 1959, the testator saw and talked with neighbors and friends of long standing and appeared to be normal. However, on January 22, 1959, he lapsed into a coma and died on February 6, 1959, in his eighty-first year, without ever having regained consciousness.

Sometime around the early part of December in 1958, the testator saw the friend who had advised him to execute the original will. On this occasion the friend pointed out that since he no longer owned the Crawford Street property, the testator should so revise his will as to substitute the South Street property for the property previously devised to the caveatee. It was for this purpose that the testator requested the caveatee [John] to take him to the office of the attorney. The matter of the execution of a new will was discussed with the draftsman out of the presence of the caveatee, and when it had been prepared, the testator returned to the office of his attorney and executed the will on December 12, 1958. The original will was withdrawn from the office of the Register and delivered to the testator, and was apparently destroyed.

The probated will revealed that the testator had devised his South Street home to the caveatee and had bequeathed his personal estate to the caveators. He had also appointed the caveatee as the executor. There was proof that no change other than the substitution of the last home for the first had been made in the second will. But this fact was disputed by one of the caveators [Virginia] who claimed that the first will, except for several articles of personalty bequeathed to the caveatee [John], provided that the estate was to be divided between the four children.

On this appeal the real questions are whether the issues of (i) undue influence and (ii) mental capacity should have been submitted to the jury. We shall consider each issue

separately and, in so doing, shall relate such additional testimony as may be necessary.

### (i). Undue Influence.

It has been held by this Court that in order to justify the submission of an issue of undue influence to a jury it is necessary "to find in the record some evidence from which it might be rationally inferred that at the time of making his will the testator was under the domination of an influence which prevented the exercise of his own judgment" and that "[t]he influence which the law condemns as undue is that which is operative to such a degree as to amount in effect to coercion." *White v. Bramble*, 124 Md. 395, 400, 92 Atl. 763, 765 (1914). What then is the state of the record in this case?

A careful reading of the entire record fails to disclose that *any* influence—either undue or legitimate—was practiced on the testator by the caveatee. The caveators *seem* to suggest that because the caveatee lived with his father without paying rent (though he paid some of the taxes, utility charges and other household expenses); because he looked after the physical needs of his father; because he attended to the business affairs of his father; and because, at the request of his father, he took him to execute a new will, and then arranged to withdraw the old one from safekeeping, that he had in some manner thereby exercised undue influence on the testator. Clearly such facts fall far short of amounting to coercion. Furthermore, there was no showing that the son dominated his father, took away his free agency or prevented the exercise of his own judgment and choice. See *Kennedy v. Kennedy*, 124 Md. 38, 91 Atl. 759 (1914); *Sellers v. Qualls*, 206 Md. 58, 110 A. 2d 73 (1954). On the contrary, these facts do not even raise a conjecture or a suspicious circumstance, and clearly did not justify submission of the issue of undue influence to the jury. *Kuenne v. Kuenne*, 219 Md. 101, 148 A. 2d 448 (1959). Moreover, even if we assume that the son did in fact have the power to overbear the will of his father, there is absolutely no evidence that the son ever undertook to exercise it. See *Woodruff v. Linthicum*, 158 Md. 603, 609, 149 Atl. 454, 456 (1930). Since there was no evidence of *any* undue influence, the trial court should have granted the caveatee's motion for a directed verdict on the issue of undue influence.

### (ii). Mental Capacity.

On an appeal to this Court from the refusal of a motion for a directed verdict for the caveatee on an issue of mental capacity, it is our duty to examine the evidence and determine whether from it a jury might reasonably have concluded that the testator was mentally incompetent to execute a valid will. *Lyon v. Townsend,* 124 Md. 163, 176, 19 Atl. 704, 708 (1914). What then does the evidence show as to the mental incapacity of the testator?

The two lay witnesess for the caveators (both of whom—Cleona and Virginia—were parties to the caveat proceeding), in an effort to demonstrate competency to express an opinion as to the testator's lack of mental capacity, testified as to certain physical infirmities and characteristic oddities of the testator, but, upon objection by the caveatee, the witnesses were properly precluded—since they could not qualify—from expressing an opinion as to the mental capacity of the testator on the date the will was executed. *West v. Fidelity-Balto. Bank,* 219 Md. 258, 147 A. 2d 859 (1959).

The urologist was the only other witness called to testify as to the mental capacity of the testator. Obviously, the witness was not called as an expert who must first qualify since he did not hear all of the testimony and no attempt was made to have him answer hypothetical questions, but, over the objection of the caveatee, he was permitted to testify as an "attending physician." Specifically, he testified that when the testator was admitted to the hospital the first time [April 25-June 5] he was "feeble," "confused" and "entirely disoriented," but that his mental condition improved. When he saw him about a month later [July 9-July 21] the word "senility" was added to the diagnosis "because he was incapable of exercising judgment for his own benefit," but again his mental condition gradually improved. There was no testimony as to the mental condition of the testator on the last day [August 6] that it was last recorded that he had been seen as an outpatient. Nor was there any testimony with respect to the testamentary capacity of the testator when the urologist believed he had seen him in October. When the testator was last admitted to the hospital as an inpatient [January 22, 1959] he was in

a "coma," "unconscious" and "could not be aroused" or "answer questions." When the urologist was asked to express his opinion as to whether or not the testator was capable of making a valid deed or contract on the date the will was made, over the objection of the caveatee that he was not qualified, he replied that:

> "In December, 1958, it is quite clear to me he didn't have enough judgment to see me or see some doctor about his condition, about his urine drainage, and if he didn't have enough judgment to look after this simple thing that was important to him, it seems clear to me that he wasn't in possession of sufficient mental capacity to make a contract, *although I didn't see him in December*. I had seen him on previous occasions when his blood urea was high and he was definitely uremic. In other words, had uremic poisoning. And he didn't, as I say, possess enough judgment to do simple things to look after himself. So it seems to me that it should be clear to *assume* that his judgment wasn't good enough to make a contract." (Emphasis added.)

On cross-examination, the witness frankly testified that kidney trouble was quite common and did not always cause mental incompetency, that the testator had clear moments and clear days after the inlying catheter had been installed and reiterated that he could not say whether or not the testator was lucid on the date the will was executed.

The law presumes that every man is sane and has capacity to make a valid will, and the burden of proving the contrary rests upon those who allege that he lacked mental capacity. *Cronin v. Kimble,* 156 Md. 489, 494, 144 Atl. 698, 700 (1929); *Smith v. Shuppner,* 125 Md. 409, 417, 93 Atl. 514, 517 (1915). Moreover, in the absence of proof of prior permanent insanity, it must be shown that the testator was of unsound mind at the time the will was executed in order to overcome the presumption of sanity. *Acker v. Acker,* 172 Md. 477, 192 Atl. 327 (1937); *Gesell v. Baugher,* 100 Md. 677, 60 Atl. 481 (1905).

In this case, since the only evidence of the mental incapacity of the testator was given by the urologist, the question as to whether it was proper to submit the issue of mental capacity to the jury must stand or fall on his testimony. The caveatee, in contending that the urologist was not an attending physician, insists that he should not have been allowed to express an opinion as to mental capacity. It is by no means certain, as an examination of some of the cases disclose,[1] that the urologist was in fact an attending physician. But, even if we assume that he was, we think it is clear, as the caveatee further contends, that the testimony of the witness was not legally sufficient to show mental incapacity at the time the will was made. Other than the positive knowledge that the witness had gathered on two prior occasions [in April and again in July of 1958]—that the testator was definitely uremic and his general professional knowledge that nephritis could and often did lead to impaired mental processes—the only other basis for his opinion that the testator was without testamentary capacity when he executed his will was that he did not have enough judgment to take care of his own simple physical needs. It was for this reason, so he testified, that he assumed that the testator's judgment was not "good enough" to make a valid will on the date it was executed. On the other hand, he also testified that a kidney condition did not invariably

---

1. In *Crockett v. Davis,* 81 Md. 134, 31 Atl. 710 (1895), the physician had attended the testatrix for a number of years including the time when the will was made. In *Wagner v. Klein,* 125 Md. 229, 93 Atl. 446 (1915), the physician who had attended the testatrix only twice before the date of the will and thereafter three times a day for eleven days until she died was not permitted to testify as an attending physician. In *Livingston v. Safe Deposit & Trust Co.,* 157 Md. 492, 146 Atl. 432 (1929), the physician had attended the testatrix for twelve or fifteen years and during the last six weeks of her life had seen her every day. In *Love v. Love,* 158 Md. 481, 148 Atl. 814 (1930), the physician, though he did no more than discuss the time of day with the testatrix, had been in attendance during the two year period within which the will was made. And in *Davidove v. Duvall,* 160 Md. 345, 153 Atl. 417 (1931), the physician had attended the testatrix throughout the period of a month during which the will was executed.

or continuously cause mental incompetence, that the testator did in fact have lucid intervals of as much as a day's duration and, which is more significant, he was unable to relate his opinion to the date on which the will was made because he had not seen the testator for at least two months. It may be, since the principal reason given by the urologist for his opinion was based on an *assumption* that because the testator was without enough judgment to see a doctor about his physical condition he lacked mental capacity to make a valid will, that such reason was insufficient in law to support his opinion. Under similar circumstances in *Grant v. Curtin,* 194 Md. 363, 71 A. 2d 304 (1950), it was held that the reasons given for an opinion of a physician which was only admissible because he *was in attendance on* the testator were not sufficient. Moreover, evidence that a person has a progressive though not incessant disease which may or must eventually culminate in mental incapacity cannot prove, or standing alone tend to prove, that at a given time he was actually so affected. *Horner v. Buckingham,* 103 Md. 556, 563, 64 Atl. 41, 43 (1906); *Sellers v. Qualls, supra.*

It is true, of course, that evidence tending to prove competency in general may relate to the entire period of acquaintance of a witness with a testator both before and after the date of the making of a will. *Jones v. Collins,* 94 Md. 403, 411, 51 Atl. 398, 400 (1902); *Harris v. Hipsley,* 122 Md. 418, 435, 89 Atl. 852, 857 (1914). But evidence produced to show lack of testamentary capacity must relate to the mental condition of the testator at the time the will was executed. In *Baugher v. Gesell,* 103 Md. 450, 63 Atl. 1078 (1906), it was said at p. 457:

> "The want of testamentary capacity must, when urged as a ground for the invalidity of a testamentary act * * * relate to the time of the act. Unless want of capacity, *permanent in character* be established by proof as existing at a time prior to the act, * * * the presumption of capacity attends the act, and must be overcome by evidence that affords a rational basis for an inference of the want of it *at the*

*very time* of the execution of such act." (Emphasis added.)

See also *Willis v. Willis,* 171 Md. 144, 188 Atl. 217 (1936) [incapacity limited to date of will]; *Cronin v. Kimble, supra* [all evidence must relate to mental capacity of testator on date of execution of will]; *Hutchins v. Hutchins,* 135 Md. 401, 109 Atl. 121 (1919) [when the opinion is intended to prove *incapacity* rather than capacity, the interrogatory must be specifically directed to the time of the testamentary act]; *Kelly v. Kelly,* 103 Md. 548, 63 Atl. 1082 (1906) [it is essential to show that incapacity existed at date of execution of will]. See also *Masius v. Wilson,* 213 Md. 259, 131 A. 2d 484 (1957) [evidence tending to show incapacity must relate to the critical date]. And see *Daugherty v. Robinson,* 143 Md. 259, 122 Atl. 124 (1923) [evidence of incapacity is not admissible except as of date of will].

So, without taking into consideration the positive testimony of the attesting witnesses and the scrivener, all of whom were attorneys-at-law, that the testator was possessed of a sound mind, and the testimony of his friends and neighbors, we think it is clear that the testimony of the urologist was not sufficient to support a rational inference of mental incapacity at the time the will was executed, and for that reason, the trial court should have directed a verdict for the caveatee or entered a judgment *n.o.v.* on the issue of mental capacity.

Pursuant to Maryland Rule 875, the order of the lower court will be reversed and judgment *n.o.v.* will be entered in favor of the caveatee to the end that the verdicts of the jury on Issue 2 [undue influence] shall be "No" and on Issue 3 [mental capacity] shall be "Yes".

> *Order reversed and judgment n.o.v. entered in favor of caveatee to the end that verdicts of jury on Issue 2 shall be "No" and on Issue 3 shall be "Yes", the costs of this appeal to be paid by the appellees.*