WEBSTER, Personal Representative of the Estate of
Julia Eva Pollitt *v.* LARMORE ET AL.

\* \* \*

LARMORE ET AL. *v.* WEBSTER, Personal Representa-
tive of the Estate of Julia Eva Pollitt

[No. 158, September Term, 1972.]

*Decided February 9, 1973.*

154

The cause was argued before MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Victor H. Laws,* with whom were *Long, Laws, Hughes & Bahen* on the brief, for the caveatee.

*John B. Robins,* with whom were *Robins, Robins & Johnson* on the brief, for the caveators.

SINGLEY, J., delivered the opinion of the Court.

This is an appeal by a personal representative from an adverse decision, determination, or ruling of a court of law in a caveat case to which issues had been sent from an orphans' court to be tried, Maryland Code (1957, 1968 Repl. Vol.) Art. 5, § 2; *Syfer v. Dolby,* 182 Md. 139, 152, 32 A. 2d 529 (1943). Consolidated with it is a second appeal by the successful caveators from orders of the orphans' court authorizing the personal representative to pay, from the assets of the decedent's estate, the fees and expenses of counsel incurred in the defense of the caveat action and to be incurred in this appeal.

Julia Eva Pollitt (Julia) died on 4 November 1970 at Eastern Shore State Hospital, a State mental hospital, at Cambridge, Maryland. At the time of her death, Julia was 72 years of age. Although she had been married twice, once to John May of Princess Anne, whom she had divorced in about 1954, and then to Austin G. Brumley, whom she married in February, 1965, Julia had no children. She had been married to May for some two years. Brumley had lived with her less than a month, and she divorced him in June, 1966.

In November, 1964, prior to her marriage to Brumley, Julia had gone with him to the Salisbury office of Walter D. Webster, an attorney. There she gave Mr. Webster instructions regarding the preparation of a will, which was signed on 28 December 1964 at Julia's home in Salisbury in the presence of Mr. Webster, Mr. Webster's secretary and Brumley, who acted as witnesses. The original will was in Mr. Webster's custody at the time of Julia's death.

The value of Julia's gross estate was about $29,000.00. Under her will, Julia devised her Salisbury residence to her nephew, James M. Larmore; bequeathed $1,000.00 to her sister, Bertha Larmore; left bequests totalling $1,500.00 to friends; gave $500.00 to each of two churches, and bequeathed the residue of her estate to Brumley. In spite of the fact that she and Brumley were separated and later divorced and that Brumley had remarried, Julia never modified or expressly revoked her will.

Some time before Julia's will was offered for probate, the appellees, Bertha Larmore and Elmer M. Pollitt, Julia's sister and brother and only surviving next of kin, filed in the Orphans' Court for Wicomico County a petition and caveat to Julia's will on grounds of lack of mental capacity and undue influence.

The orphans' court regarded this as a request for judicial probate, Code (1957, 1969 Repl. Vol.) Art. 93, § 5-207 (b). On 20 April 1971 it admitted the will to probate and appointed Mr. Webster, the executor named in the will, as personal representative of Julia's estate. Issues raising the questions of testamentary capacity and of undue influence were framed and transmitted to the Circuit Court for Wicomico County for trial before a jury.

After a three-day trial, the case went to the jury on only the first issue:

"Was the alleged testatrix, Julia Eva Pollitt, of sound and disposing mind, capable of executing a valid deed or contract at the time the alleged Will dated December 28, 1964, was executed?"

The jury answered this question in the negative.

Mr. Webster, as caveatee, appealed from the verdict entered in favor of the caveators.[1] Mrs. Larmore and her

---

1. He then filed a motion for a judgment *n.o.v.* which was denied. By stipulation of counsel and order of court, Webster renewed his appeal from the verdict, which we shall regard as encompassing the decision and rulings of the trial court, including that on the motion for judgment *n.o.v.*, Syfer v. Dolby, 182 Md. 139, 152, 32 A. 2d 529 (1943).

brother, as caveators, have appealed from an order of the orphans' court authorizing Mr. Webster to pay from funds of the estate an amount of $1,270.50 to his counsel, being the aggregate of fees and expenses incurred in the defense of the caveat action, as well as from an order authorizing payment from the estate of costs and expenses incurred in connection with this appeal.[2] By agreement of counsel, these two appeals were consolidated.

Mr. Webster argues first, that the trial court erred in admitting testimony and evidence respecting Julia's mental condition and hospitalization at times remote from the date of execution of the will and second, that since this evidence should have been excluded, it was error to deny his motion for a directed verdict in his favor, made at the end of the caveators' case, and renewed at the end of the entire case, and alternatively, to deny his motion for judgment *n.o.v.*

Mrs. Larmore and her brother contend that the expense of an unsuccessful defense of the caveat action and of an appeal from an adverse verdict should not be borne by the estate.

### The Admissibility of the Evidence

Mr. Webster maintains that the rule of our cases is that while evidence tending to prove competency may relate to periods both before and after the date when a will is executed, proof of incompetency must relate to the critical date when the will was made.

We restated the rule of the cases, speaking through Judge Horney, in *Arbogast, Executor v. MacMillan,* 221 Md. 516, 525, 158 A. 2d 97 (1960):

> "It is true, of course, that evidence tending to prove competency in general may relate to the entire period of acquaintance of a witness with a testator both before and after the date

2. Costs in the trial court amounted to an additional $780.00.

of the making of a will. *Jones v. Collins*, 94 Md. 403, 411, 51 A. 398, 400 (1902) ; *Harris v. Hipsley*, 122 Md. 418, 435, 89 A. 852, 857 (1914). But evidence produced to show lack of testamentary capacity must relate to the mental condition of the testator at the time the will was executed."

This is the logical consequence of the presumption of testamentary capacity, stated in the same opinion, 221 Md. at 523:

"The law presumes that every man is sane and has capacity to make a valid will, and the burden of proving the contrary rests upon those who allege that he lacked mental capacity. *Cronin v. Kimble*, 156 Md. 489, 494, 144 A. 698, 700 (1929) ; *Smith v. Shuppner*, 125 Md. 409, 417, 93 A. 514, 517 (1915). Moreover, in the absence of proof of prior permanent insanity, it must be shown that the testator was of unsound mind at the time the will was executed in order to overcome the presumption of sanity. *Acker v. Acker*, 172 Md. 477, 192 A. 327 (1937) ; *Gesell v. Baugher*, 100 Md. 677, 60 A. 481 (1905)."

*See also Waple v. Hall*, 248 Md. 642, 657-58, 238 A. 2d 544 (1968) ; *Ingalls v. Trustees*, 244 Md. 243, 260, 223 A. 2d 778 (1966).

At the commencement of the trial of the case, there was an extended colloquy between the court and counsel out of the presence of the jury as regards the admissibility of evidence bearing on the alleged incompetence of a testator which related to events remote in time from the date when the will was executed. The trial judge finally concluded that the proper manner of dealing with the question was to rule on the admissibility of evidence as it was adduced, which he did, admitting it over the objection of the personal representative.

It would seem that the lower court found particularly persuasive *Kelley v. Stanton,* 141 Md. 380, 118 A. 863 (1922), a caveat case which held that it was not reversible error to admit in evidence the inquisition of a jury in an incompetency proceeding conducted 28 months after the testator had executed his will, which had resulted in an adjudication that he was of unsound mind. After considering the cases which had preceded and have succeeded *Kelley,* we conclude that the holding there must be confined to the peculiar posture of that case, which reversed, on other grounds, a verdict in favor of the caveators. Of particular interest is the court's conclusory comment, which appears at 141 Md. 397:

> "The inquisition is also without sufficient probative force to show testamentary incapacity at the time the will was made, in the absence of any evidence tending to show that the mental condition of the testator existing at the date of its return extended back to the date of the execution of the will . . . ."

After the proceedings relating to the probate of the will had been introduced, the caveators called Dr. Earl M. Beardsley, a general practitioner, who testified that he had seen Julia as a patient "every two or three months" commencing in the fall of 1962. Over objection, he was permitted to testify that on 13 April 1967, 28 months after she signed the will, Julia had been admitted to Peninsula General Hospital at a time when she was ". . . confused . . . disoriented . . . upset and agitated . . . ." and that shortly thereafter, Julia was committed on the certificate of two physicians to Eastern Shore State Hospital, suffering from what had been diagnosed as chronic brain syndrome or cerebral arteriosclerosis.

In response to a question as to the duration of the disease, Dr. Beardsley said:

> "I think it is only with difficulty that you—that you can—I don't think a person could actually

state the onset of such a condition. However, I felt in Miss Pollitt's case that this had been developing since I had known her in 1962."

On cross-examination, Dr. Beardsley said that he had seen Julia on 29 January 1964, on 17 July 1964, on 6 March 1965 and on 23 March 1965. His testimony was that on 17 July, she complained of being "tired and somewhat run-down" and that he had prescribed a sedative and an antacid, and that on 6 March, her complaint was a cold and cough, and he gave her cough syrup.

Dr. Beardsley admitted that his office notes relating to those visits disclosed nothing with respect to Julia's mental condition. In response to a question, he said that he did not feel "qualified" to express an opinion as to Julia's mental capacity on 28 December 1964.

The caveators' next witness, William Johnson, one of the legatees, testified that Julia had lived with him, taking care of his child, from September, 1947 until her marriage to Mr. May in 1952; that he saw her or talked to her "two or three times a week" after she moved to Salisbury in 1954. He was vague as to dates, but described Julia's frequent spells of apprehension, her loss of her bank book, and an occasion when she had him arrested for trespassing.

Mrs. Winnie Evans, who lived across the street from Julia, and had known Julia from the early or middle 1950's, saw her two or three times a week, when she sought help, thought "somebody was trying to burglarize her home—they were in her home going to do her bodily harm, and they were trying to get her money."

Mrs. Evans continued:

"I would calm her down in my home which, as I said, she was highly agitated, incoherent, and it would take me sometimes as much as two hours getting her calmed down.

"After I got her calmed down, then I would

go home with her and give her assurance that there was no one in the home.

* * *

"If it was an essentially bad spell that I couldn't control her, I would call her brother, Elmer."

In response to a question, Mrs. Evans admitted that this happened in 1961, but recalled that just before Christmas in 1964, Julia "had one of the worst spells I have ever seen her have." She testified that in early 1965, Julia seemed not to have remembered that she had married Brumley.

The testimony of another neighbor, Mrs. Catherine Rickards, was essentially similar to Mrs. Evans' except that she was even less certain as to dates, particularly since she and her husband had been in Arizona from 1960 to December, 1963, and had no recollection of events in December, 1964.

Lieutenant Walter Evans, of the Salisbury police force, the husband of Mrs. Winnie Evans, testified that Julia frequently called the Salisbury police department, but could not pinpoint the times, or relate any calls to December, 1964 or even to the year 1964.

George Rickards, the husband of Catherine Rickards, gave the most succinct account of Julia's conduct:

"On numerous occasions Miss Pollitt had come to our home asking for help, or that she was upset and would like to visit in our house for a while; that someone had taken her pocketbook; or that she had lost her keys and had locked herself out of her home; that she misplaced some of her kitchenware—knives, forks and spoons, kitchen utensils, pots and pans; but more or less it centered around her pocketbook and her keys and her money, and her locking herself out of her home.

"When this would happen I would take my tools and go over to a back window, open it up, go in and open up her door, and get her back in her home.

"We got to the point where we even suggested that she pin an extra key to her clothing—or my wife suggested a chain or a string with a key around the neck.

"The frequency was such that it got to be a problem, a real problem, of working to keep up with the things.

"I would go over with her when she lost her pocketbook, or my wife and I would go over, and sometimes several neighbors would be there at the same time.

"We would find her pocketbook or her keys—generally it was her pocketbook—and it would be in the refrigerator, in the washing machine, in the stove, behind the stool in the bathroom, or under the pillow, or some other place she had put it and had misplaced it."

He could not, however, relate this account to a date more precise than the years 1964-1965.

Elmer M. Pollitt, Julia's brother, testified that he visited his sister "two or three times a month" and that in 1964, ". . . she would be in terrible ways sometimes when I stopped there." "She was always nervous and upset, and people had been in her house—couldn't keep nothing there—stolen everything—didn't used to be nothing like it was years back. And she was just a nervous wreck."

Dr. C. W. Powell, a psychiatrist called as a witness for the caveators, testified that he had been associated with Eastern Shore State Hospital from 1963 until 1971 as Clinical Director, and in that capacity had first examined Julia for between 45 minutes and one hour on 5 June of 1967, in connection with a competency proceed-

ing which was about to be instituted. Over objection, he was allowed to testify that Julia was then incompetent "due to a chronic brain syndrome associated with cerebral arteriosclerosis manifested by confusion, disorientation and delusions that people are stealing her money." Again over objection, Dr. Powell was permitted to testify that in his opinion, Julia was incompetent in December of 1964.

He said that Julia was released on 13 August 1967, was readmitted to the hospital on 17 April 1969, and died there on 4 November 1970. At the conclusion of Dr. Powell's testimony, again over timely objection, there was admitted in evidence Julia's record at Eastern Shore State Hospital, which also contained a transcript of the 1967 hospitalization at Peninsula General Hospital.

Also introduced over objection were the records of the incompetency proceeding instituted against Julia by her brother in June of 1967, which resulted in her adjudication, and the appointment of her brother as her committee.

James Larmore, Julia's nephew, testified that his aunt had had "spells" of loss of memory since the 1940's, which "gradually got worse."

At the conclusion of the caveators' case, Mr. Webster moved for a directed verdict on the issues of mental incapacity and undue influence. The court denied the motion as regards the former, but reserved ruling on the latter until the end of the caveatee's case, when it was granted.

Mr. Webster, called as a witness in his own behalf, said that he first met Julia in the summer of 1964, and noticed nothing unusual or strange about her, nor any tendency toward forgetfulness. He told of receiving Julia's instructions, of drafting the will, of taking the will to Julia's house, where it was executed. He concluded that Julia, a "tidy . . . old maid" in his opinion, was "rather normal."

Miss Frances Landing, assistant secretary of the Larmar Corporation, testified that Julia had purchased

her house from Larmar in 1954; that on 7 December 1964, Julia had released a 6% mortgage from Larmar for $15,000.00 which she had held since 1953, and had accepted in exchange Larmar's note for the same amount, bearing the same rate of interest. Miss Landing said that Julia frequently came to Larmar's office to collect the mortgage interest checks; that she had gone with Julia to the safe deposit vault in December to get the mortgage and again on 5 January 1965 to leave bonds of Larmar Corporation which were exchanged for the note. She noticed nothing unusual about Julia.

Mrs. Teresa Lank, a sister of Austin Brumley, testified that she had operated a beauty shop across the street from Julia's house from sometime in the 1930's until 1956, that Julia was one of her customers, and the witness had noticed nothing unusual or strange about her, nor was she aware of any change in February, 1965, when she spent about two hours with Julia and Brumley at her mother's house.

At the conclusion of all the evidence, Mr. Webster renewed his motion for a directed verdict on the issue of testamentary capacity, which was denied, and the case was submitted only on the issue of mental capacity to the jury which returned a verdict for the caveators. Mr. Webster's motion for a judgment *n.o.v.* was denied, and this appeal followed.

We think that the trial court erred in not granting the caveatee's motion for a directed verdict. The rule of our cases is that urged on us by the caveatee: that while testimony tending to establish competency may relate to periods preceding or succeeding the execution of the will, testimony tending to establish incompetency must reasonably relate to the date of execution, *Jackson v. Jackson,* 249 Md. 170, 173-75, 238 A. 2d 852 (1968); *Arbogast v. MacMillan, supra,* 221 Md. at 525-26; *Masius v. Wilson,* 213 Md. 259, 268, 131 A. 2d 484 (1957); *Willis v. Willis,* 171 Md. 144, 152, 188 A. 217 (1936); *Daugherty v. Robinson,* 143 Md. 259, 268, 122 A. 124 (1923);

*Hutchins v. Hutchins,* 135 Md. 401, 404, 109 A. 121 (1919) ; *Kelly v. Kelly,* 103 Md. 548, 553, 63 A. 1082 (1906) ; *Baugher v. Gesell,* 103 Md. 450, 457, 63 A. 1078 (1906) ; *Gesell v. Baugher,* 100 Md. 677, 682, 60 A. 481 (1905). If that were not so, a caveat action could never be defended, as it frequently is, on the ground that a will was executed at a time when the testator had a lucid interval.

While there was testimony to support the notion that Julia was eccentric, erratic, forgetful, and may have had delusions of persecution, this, standing alone, is not enough. We have held that mere eccentricity is not enough, *Jones v. Collins,* 94 Md. 403, 409-10, 51 A. 398 (1902) ; nor are forgetfulness, lapse of memory, failure to recognize acquaintances, *Giardina v. Wannen,* 228 Md. 116, 123-25, 179 A. 2d 357 (1962) ; *Mecutchen v. Gigous,* 150 Md. 79, 84-85, 87, 132 A. 425 (1926) ; nor delusions, unless the will is a product thereof, *Doyle v. Rody,* 180 Md. 471, 477-78, 25 A. 2d 457 (1942) ; *Harris v. Hipsley,* 122 Md. 418, 431, 89 A. 852 (1914). Neither old age nor debility is necessarily a yardstick of mental capacity, *Cronin v. Kimble,* 156 Md. 489, 494-97, 144 A. 698 (1929) ; nor are peculiarities or oddities, *Lynn v. Magness,* 191 Md. 674, 681, 62 A. 2d 604 (1948) ; *Wood v. Hankey,* 133 Md. 389, 396, 105 A. 430 (1918) ; and *see generally West v. Fidelity-Baltimore Bank,* 219 Md. 258, 263, 267, 147 A. 2d 859 (1959) and *Berry v. Safe Deposit & Trust Co.,* 96 Md. 45, 55-56, 53 A. 720 (1902) as to the cumulative effect of peculiarities.

None of the caveators' witnesses so much as intimated that she failed to meet the classic test which is that derived from *Davis v. Calvert,* 5 G. & J. 269, 300-01 (1833) :

"Whether a testator had sufficient mental capacity is determined by a consideration of his external acts and appearances. It must appear that at the time of making the will, he had a full understanding of the nature of the business in which he was engaged; a recollection of the property of which he intended to dispose and

the persons to whom he meant to give it, and the relative claims of the different persons who were or should have been the objects of his bounty." Sykes, *Contest of Wills in Maryland* § 61 at 72 (1941).

While stated with slightly varying forms of expression, our decisions and those of our predecessors have uniformly adhered to this standard, *Brown v. Fidelity Trust Co.*, 126 Md. 175, 180, 94 A. 523 (1915) ; *Davis v. Denny*, 94 Md. 390, 392, 50 A. 1037 (1902).

Indeed, the first order of business when Julia visited Mr. Webster in November, 1964 was the preparation and signing of a paper by which she endeavored to revoke any testamentary provision she might have earlier made for her brother Elmer. Later, she told Mrs. Lank that she had married Brumley so that her brother could not share in her estate. By her will, she left her residence to her nephew. The cash bequests totalling $3,500.-00 would appear to have been probably less than her bank account balance, even apart from the Larmar mortgage, with the result that the testamentary plan was consonant with her assets.

Of all the caveators' witnesses, only two, Dr. Beardsley and Mrs. Evans, were able to relate their testimony with precision to a time reasonably close to the date when the will was signed. Dr. Beardsley saw Julia on two somewhat relevant occasions: once, five months before the will was executed, and again three months later. Mrs. Evans told of an episode of apprehension or depression a day or so before Christmas, 1964. Assuming, without deciding, that all of this was near enough to the critical date to be admissible on the question of incompetency, it is clear that Dr. Beardsley was treating Julia for minor ailments, and that her mental condition was not so deviant as to be remarkable. That he was reluctant to express an opinion as regards her mental condition on 28 December 1964 can in no way be equated to proof of incompetency.

Mrs. Evans' testimony that some day before Christmas in 1964, Julia had one of her "worst spells" is of no probative significance either. It is apparent that these periods of excitement, or apprehension, or depression were short lived—the longest, according to Mrs. Evans, lasting two hours—and were in no sense evidence of a continuing lack of testamentary capacity. Taken in context with Mr. Webster's testimony fixing the dates of 17 November and 28 December, when Julia appeared entirely normal to him,[3] and Miss Landing's testimony that Julia appeared normal and able to conduct her business affairs in early December and again in early January— all of which was clearly admissible under our decisions— Mrs. Evans' testimony can scarcely be said to raise a conflict of any consequence.

The testimony of Dr. Powell was clearly inadmissible, as were the records of Eastern Shore State Hospital, and of the incompetency proceeding. Julia was not admitted until April, 1967, 28 months after the date of the will, a date too remote to have any probative value, absent positive proof that the illness for which she was hospitalized was incapacitating on 28 December 1964. Dr. Powell's opinion testimony, based on a one-hour examination of Julia in June, 1967, in preparation for the incompetency action, which admittedly did not cover her medical history or include a detailed examination, should be considered in the light of our predecessors' holding in *Horner v. Buckingham,* 103 Md. 556, 563, 64 A. 41 (1906) :

> "Evidence that the person has a disease which may or must eventuate in mental disease cannot prove, or standing alone tend to prove, that at a given point of time that he is actually so afflicted. The tendency to mental infirmity, cannot *per se* prove the infirmity, it must be shown by facts."

---

3. At time of trial Brumley, an attesting witness, had died. The other, Mr. Webster's secretary, was hospitalized.

168

There was simply not sufficient evidence to lay a foundation for Dr. Powell's opinion, and we so held in *Sachs v. Little,* 245 Md. 343, 361-62, 226 A. 2d 283 (1967). *See also Sellers v. Qualls,* 206 Md. 58, 67-68, 110 A. 2d 73 (1954) ; *Grant v. Curtin,* 194 Md. 363, 384-86, 71 A. 2d 304 (1950) ; *Berry v. Safe Deposit & Trust Co., supra,* 96 Md. at 57-59.

Finally, we turn to the question whether the evidence was legally sufficient to be submitted to the jury on the issue of Julia's testamentary capacity on 28 December 1964.

In considering whether the facts are sufficient, on a motion for directed verdict, or on a motion for judgment *n.o.v.,* all conflicts in the evidence must be resolved in favor of the caveators and the Court must assume the truth of the evidence produced in their behalf as well as all reasonable inferences which may be drawn in their favor from all the evidence, *Sachs v. Little, supra,* 245 Md. at 363; *Ingalls v. Trustees, supra,* 244 Md. 247.

But the general rule is obviously qualified by an overriding condition: that such a consideration must be limited to legally admissible evidence. Here, under the most liberal application of the Maryland rule, only the testimony of Dr. Beardsley and of Mrs. Evans was of any possible relevancy, even assuming its admissibility. Of course, Mr. Webster's testimony regarding Julia's condition at the time of the execution of the will on 28 December 1964 was clearly admissible and remained uncontroverted, as was Miss Landing's.

Taken together, with all the inferences to be drawn, we have the familiar picture of an elderly and eccentric woman, who was frequently depressed, apprehensive and forgetful, who at times must have been a bane of the existence of her neighbors, family and friends. But we have also the picture of a woman who was tidy, kept house for herself, took care of her business affairs, knew what her assets were and what she wanted to do with them, and appeared normal to the draftsman of the will on the day when she gave him her instructions and again

on the day when she signed it. There was simply insufficient evidence of lack of testamentary capacity to take the case to the jury, and Mr. Webster's motion for a directed verdict or his later motion for a judgment *n.o.v.* should have been granted.

As a consequence, pursuant to Maryland Rule 875, we propose to vacate the verdict and enter a judgment *n.o.v.* in favor of the personal representative to the end that the verdict of the jury on the issue of mental capacity shall be in the affirmative.

Upon return of the verdict on the issue to the Orphans' Court for Wicomico County, that court will undoubtedly wish to consider Ch. 106 of the Laws of 1964, codified as Code (1957, 1964 Repl. Vol.) Art. 93, § 351 (d) which provided that a will insofar as it made provision for a testator's spouse would be revoked by a final decree of absolute divorce granted subsequent to the execution of the will and after June 1, 1964, unless the will or the divorce decree contains a contrary provision.[4] It will be recalled that Julia's will was executed on 28 December 1964; that she was married on 19 February 1965 and that the decree of divorce *a vinculo matrimonii* was entered on 13 June 1966. Despite the fact that Code Art. 93, § 351 (d) was repealed by Ch. 3 of the Laws of 1969, it is abundantly clear that it was in full force and effect at the time of the execution of the will, of the marriage and of the divorce. In this connection, *see also* Code (1957, 1969 Repl. Vol.) Art. 93, § 4-105 (d) and Miller, *The Construction of Wills in Maryland* § 65 at 181 (1927). In the event that it is found to be applicable,

---

4. "§ 351. Revocation of wills or codicils.
   No will or codicil in writing, nor any clause thereof, shall be revoked otherwise than as provided herein:
   * * *
   (d) By a final decree of absolute divorce of a testator and his spouse, granted subsequent to the execution of the testator's will or codicil and after June 1, 1964; and all provisions in said will or codicil relating to the divorced spouse, and only as to such provisions, shall be revoked unless otherwise provided in the will or codicil or the decree."

the residuary bequest to Brumley was revoked by the divorce decree and the residuary estate will pass to Julia's next of kin as if she had died intestate.[5]

*The Orders Authorizing Payment
of the Fees and Expenses*

Code (1957, 1969 Repl. Vol.) Art. 93, § 7-603 is applicable to estates of decedents dying after 1 January 1970 and provides:

"When any personal representative or person nominated as personal representative defends or prosecutes any proceeding in good faith and with just cause, whether successful or not, he shall be entitled to receive from the estate his necessary expenses and disbursements."

It seems to us that the prior law, exemplified by *Koenig v. Ward*, 104 Md. 564, 566, 65 A. 345 (1906) on which the caveators rely, was first altered by Ch. 200 of the Laws of 1966, applicable to estates of persons dying after 1 June 1966:

"When any person designated as an executor in a will, or the administrator with the will annexed, defends the will or prosecutes any proceedings in good faith and with just cause for the purpose of having the will admitted to probate, whether successful or not, he shall be allowed out of the estate his necessary expenses and disbursements, including reasonable attorney's fees in such proceedings."

Ch. 200, which was codified as Code (1957, 1964 Repl. Vol., 1966 Supp.) Art. 93, § 49 A, the statutory progenitor of § 7-603, made it clear that the defense of a will whether before or after probate was to be at the expense of the estate. It is quite apparent, too, that the Legisla-

---

5. We deem it inappropriate to resolve this question here because of the narrow scope of this appeal which involves only the submission of the issue of testamentary capacity to a law court for trial.

tive intent, as expressed in § 7-603, was that a defense of a will by either a personal representative (who presumably has qualified) or by a person nominated as personal representative (who presumably has not qualified) should similarly be at the expense of the estate.

The rule of *Koenig v. Ward, supra,* 104 Md. at 565, 566 and its progeny, *see Lewis v. Mason,* 156 Md. 32, 34, 143 A. 585 (1928), which held that the orphans' court had no jurisdiction to allow a fee from the estate to counsel for the caveatees when a caveat was filed before a will was admitted to probate, would not only be inapplicable to the present case, where probate had been had, *see Decker v. Fahrenholtz,* 107 Md. 515, 520-21, 68 A. 1048 (1908), but more importantly, has been dramatically altered by the General Assembly.

While it might be argued that the result which we reach here makes the caveators' contention moot, we have concluded that a resolution of the issue is not inappropriate in the circumstances. For this reason we shall affirm the orders of the orphans' court.

> *Verdict in No. 7737 Civil (The Caveat Case) vacated, and judgment N.O.V. entered in favor of caveatee to the end that the verdict of the jury on Issue No. 1 shall be "yes", the costs below and on appeal to be paid by appellees, Bertha Larmore et al.*
>
> *Orders of Orphans' Court dated 14 and 16 March 1972 authorizing payment of counsel fees and expenses below and on appeal from funds of the estate affirmed, costs on appeal to be paid by appellants, Bertha Larmore et al.*