JOHN B. SLICER ET AL. *v.* H.
GLOYD GRIFFITH ET AL.

[No. 753, September Term, 1974.]

*Decided July 23, 1975.*

The cause was argued before ORTH, C. J., and MASON, J., and ROBERT C. MURPHY, Chief Judge of the Court of Appeals of Maryland, specially assigned.

*Alger Y. Barbee* for appellants.

*Joseph B. Simpson, Jr.*, with whom were *Vivian V. Simpson, John Noble, Philip J. Santa Maria* and *Simpson & Simpson* on the brief, for appellees.

MURPHY, J., delivered the opinion of the Court.

On February 3, 1972, Raymond C. Gloyd (Gloyd), a patient at the Potomac Valley Nursing Home, signed an instrument purporting to be his Last Will and Testament leaving his entire estate to a nephew, John B. Slicer. Gloyd was then 93 years of age and in poor physical and mental health, suffering from arteriosclerosis, encephalomalacia (softening of the brain) and senility. The instrument was prepared by Judson Wood, an attorney who resided in Gloyd's home with Slicer; Wood, who was unknown to Gloyd, was named as executor of Gloyd's estate. An earlier will executed by Gloyd in 1969 was destroyed by Slicer after Gloyd signed the instrument of February 3, 1972. Gloyd died on March 12, 1972, and two days later the instrument dated February 3, 1972, was admitted to administrative probate. Subsequently a petition and a caveat was filed by a number of Gloyd's nieces and nephews. They claimed that the instrument dated February 3, 1972, was not Gloyd's will and had not been duly executed by him; that Gloyd lacked testamentary capacity to execute a will on February 3, 1972; and that the document was procured by fraud and undue influence. Issues were

thereafter framed, and the complaining nieces and nephews, as caveators, were named as plaintiffs; Slicer and Wood, as caveatees, were designated as defendants.

After opening statements of the parties had been presented at the trial before a jury in the Circuit Court for Montgomery County, the Court (Shearin, J.) ruled that since the execution of the will was not admitted by the pleadings and Gloyd's testamentary capacity had been challenged, "there has to be a prima facie showing that there is a will about which the contest arises." The court concluded that the burden was upon the caveatees, as proponents of the will, to establish "prima facie the execution of the will and the testamentary capacity of the testator first, whereupon the caveators will then proceed with their proof, lack of capacity, and lack of due execution . . . ." The caveatees objected to this procedure, claiming that testamentary capacity was the main issue in the case, and that the caveators, as the moving parties, had the burden of proving lack of testamentary capacity.

The caveatees further objected to the court's requirement that they prove prima facie execution of the will and testamentary capacity in the presence of the jury. They argued that these were preliminary matters solely for the court's determination. The court agreed that it alone would determine whether the caveatees made the requisite prima facie showing but ruled that the jury "as the trier of the ultimate issues of fact, . . . ought to have the benefit of . . . all of the testimony that is adduced." The court said that "if the two aspects of the initial proof of . . . [the caveatees'] prima facie case fall short, then conceivably the matter might be ended there" but that if the court ruled that a prima facie case of due execution and testamentary capacity had been preliminarily established by the caveatees, that testimony "would be in along with any other evidence adduced to the contrary, or further evidence on behalf of the caveatees." The court indicated that "it would save time not to have . . . [the same testimony] repeated [before the jury]," but its ruling did not preclude the caveatees from presenting the same, or additional evidence bearing on the

execution of the will, or on Gloyd's testamentary capacity to the jury at a later stage in the proceedings if they desired to do so.

In accordance with the court's procedural rulings, the caveatees produced the testimony of Sally Robbins, the administrator of the nursing home and one of the attesting witnesses, and Slicer, as well as the deposition of Betty Tomlinson, the other attesting witness. Their testimony with respect to the execution of the will was somewhat conflicting but each expressed the opinion that Gloyd was mentally competent on February 3, 1972, to execute the will. At the conclusion of their testimony, the Court ruled that the requisite prima facie showing of due execution and testamentary capacity had been made and admitted the will into evidence.

The caveators then proceeded to put on their case-in-chief. Katheryne Van Metre, a second cousin and long acquaintance of Gloyd, Mary Gloyd, a niece, and Lloyd Whalen, a neighbor, each testified with respect to Gloyd's mental condition. Dr. John G. Lodmell, Gloyd's attending physician, testified with respect to Gloyd's mental and physical condition, and the records of the nursing home, and the Montgomery County General Hospital, where Gloyd had been confined prior to his admission to the nursing home, were admitted in evidence. Following the presentation of this evidence, the caveatees moved for a directed verdict which the court denied. Thereafter, the caveatees adduced documentary evidence in support of their case, but offered no additional testimonial evidence; they chose not to repeat the testimony given on their behalf before the jury at the outset of the trial, but instead incorporated it as part of their defense and rested. The jury returned special verdicts to the effect that while Gloyd signed the instrument dated February 3, 1972, he lacked testamentary capacity to execute a will on that date, and that the purported will was procured by fraud and undue influence. This appeal followed, the caveatees claiming that the lower court erred:

(1) in requiring that they "proceed with testimony as to the execution of the will and also

to prove the competency of the testator first before any other evidence," and

(2) "in conducting preliminary hearings on the prima facie execution of the will and a prima facie determination of mental competence of the testator in the presence of the jury," and

(3) in admitting the testimony of the caveators' witnesses with respect to Gloyd's testamentary capacity, and

(4) in "submitting issues to the jury on the question of duress and undue influence," and

(5) in appointing "the foreman of the jury, who was the father of the judge's bailiff and law clerk, without having made such relationship between the two first known to the defense counsel."

It is well settled in Maryland that where, as here, the execution of the will is not admitted by the pleadings, the caveatees bear the burden of presenting a prima facie case of the execution of the will before it may be received in evidence. *Conrades v. Heller,* 119 Md. 448, 452, 87 A. 28, 31 (1913); P. Sykes, *Contest of Wills in Maryland* § 46 (1941). Not so well settled is the question whether the caveatees must also make out a prima facie case of the testator's mental capacity, where challenged, before the caveators are required to proceed with their case-in-chief. Early Maryland cases, such as *Cramer v. Crumbaugh,* 3 Md. 491 (1853), and *Waters v. Waters,* 35 Md. 531 (1872), indicate that the caveatees do have this duty. In *Cramer,* where a caveat was filed on the ground of lack of testamentary capacity, the caveatee had drawn the will and both he and his son were legatees; there the Court said that in such cases the *"onus [probandi]* is imposed on the party propounding a will; it is *in general discharged by proof of capacity and the fact of execution . . . ."* 3 Md. at 504 (emphasis in original). In *Waters,* where the validity of a will was similarly challenged on grounds of testamentary capacity, the Court said:

"The *onus* was upon the defendants [caveatees] to

prove the due execution of the will, and for that purpose it was necessary for them first to call the subscribing witnesses, to testify as to the fact of the execution of the paper, and the mental capacity of the testator at that time . . . ." 35 Md. at 537.

Another early Maryland case, *Higgins v. Carlton*, 28 Md. 115 (1868), involving a challenge to the testator's mental capacity, held that the burden of proof (in the sense of the risk of non-persuasion) rested upon the caveators. There, the Court noted at page 141 that in some states the presumption of sanity was not applicable in will contests "and that therefore a party propounding a will must not only prove execution, but must also offer positive proof of capacity." In rejecting this rule as not sustained by reason or the weight of authority, the Court stated that the presumption of sanity applied in will cases in Maryland, and that, after due execution of the will had been proved by the caveatees, the burden of establishing unsoundness of mind was upon the caveators. The Court said:

> "The very general language used in *Cramer v. Crumbaugh* . . . cannot be taken to control and alter this principle . . . . [T]he *quo modo* of proof must be in harmony with other recognized rules and principles. If capacity be established by evidence of a fact from which it is to be presumed, proof of capacity has in reality been given; and the *onus* cast upon the party propounding a will is discharged by proof of execution, because that being proved, the presumption of capacity follows."
> 28 Md. at 144.

Since *Higgins* and *Waters*, no Maryland case has directly addressed the question of *onus probandi* in precise terms of the requirement of proving a prima facie case where the issue is testamentary capacity. Cases from other jurisdictions, however, go off in all directions. Some say that the proponents of the will must, in the first instance, establish a prima facie case by proof of testamentary capacity without regard to the presumption of sanity. Other

cases hold that the burden of showing testamentary incapacity is upon the contestants throughout the trial. Still other cases indicate, as in *Higgins*, that in view of the presumption of sanity, it is only necessary for the proponents of the will to prove due execution to establish a prima facie case, after which the caveators are required to proceed with their testimony; this appears to be the view of the Maryland law taken by Sykes, *supra*, § 46 at 55. See also J. Alexander, *Law of Wills* § 399 (1917); T. Atkinson, *Law of Wills* §. 101 (2nd ed. 1953); W. Bowe and D. Parker, *Page on Wills* § 29.33 (3rd rev. ed. 1961). We think *Higgins* represents the law of Maryland and is fully consonant with the firmly established rule in this State that generally, in view of the presumption of sanity, the caveators bear the burden of proving testamentary incapacity. *See Phelps v. Goldberg*, 270 Md. 694, 313 A. 2d 683 (1974); *Webster v. Larmore*, 268 Md. 153, 299 A. 2d 814 (1973); *Ingalls v. Trustees*, 244 Md. 243, 223 A. 2d 778 (1966). *Cf. Kuenne v. Kuenne*, 219 Md. 101, 148 A. 2d 448 (1959) and *Daugherty v. Robinson*, 143 Md. 259, 122 A. 124 (1923). Accordingly, we think the lower court erred in requiring the caveatees, over their objection, to make out a prima facie case, independent of the presumption of sanity, that Gloyd possessed the requisite testamentary capacity before receiving the will in evidence.[1]

Under the circumstances of this case, the lower court's error in this regard, and its insistence that the prima facie showing of testamentary capacity be made in the presence of the jury, does not require reversal. The caveatees claim only that they were prejudiced "by the proceeding requiring them to repeat so-called pronounced 'prima facie evidence of execution and competency,' or by referring to it and incorporating it by reference into the proceeding at an awkward and prejudicial posture of the Defendants' case." They contend that prejudice resulted because they "were

---

1. It appears nevertheless that the usual practice in Maryland has followed that outlined in 9 Am. Jur. Trials, *Will Contests* §·67 (1965), *i.e.*, that the caveatees call the subscribing witnesses, elicit from them the facts regarding execution of the will, and ask specifically whether the testator appeared to possess a sound mind and memory. *See* Ingalls v. Trustees, *supra*; 22 M.L.E. *Wills* § 181 (1962); P. Sykes, *supra*, § 46.

required to conduct practically their entire case, or its main thrust, before the jury in a 'prima facie' stage of proceedings," and that they were deprived of the benefit of the presumption of sanity. We think the claim of prejudice is more illusory than real. The lower court did not require that the caveatees establish more than a prima facie case of testamentary capacity in the jury's presence. The subscribing witnesses, Robbins and Tomlinson, were entirely ample for this purpose and they testified in the usual sterile fashion of subscribing witnesses that Gloyd appeared to them to be mentally competent. The decision of the caveatees to elicit Slicer's testimony at this juncture of the proceedings was not dictated by the court. The court made it plain at the outset of the trial that if the caveatees established a prima facie case, the caveators would then be required to carry the burden of proving lack of testamentary capacity. The caveatees did make out the requisite prima facie case; they were not denied the right to move for a directed verdict at the conclusion of the caveators' case; and they were afforded the right to adduce evidence with respect to Gloyd's mental capacity after the caveators had rested their case. That the caveatees eschewed the opportunity to produce additional testimony, to reinforce their witnesses' testimony, and to have the last word was a decision in no way fastened upon them by the court. In the final analysis, the question of Gloyd's testamentary capacity was a question of fact to be decided by the jury, and nothing was placed before it that it would not otherwise have heard had the correct procedure been observed. Ultimately, the court instructed the jury "that the law presumes that every man is sane and has capacity to make a valid will and the burden of proving to the contrary by a fair preponderance of the evidence, rests upon the plaintiffs who allege that . . . Gloyd lacked testamentary capacity at the time of the alleged execution of the paper writing dated February 3, 1972. . . ." We perceive no prejudicial error.

The caveatees next claim that the caveators' testimony concerning Gloyd's lack of capacity was too remote in that it did not pertain to the time of the execution of the will. They

also contend that there was no evidence of undue influence or fraud.

To execute an effective will, the testator must be "legally competent." Maryland Code (1974), Estates and Trusts Article, § 4-101. As the comment to § 4-101 indicates, the term "legally competent" incorporates the body of law on testamentary capacity developed by the Court of Appeals. *Phelps v. Goldberg,* 270 Md. 694, 696, 313 A. 2d 683, 684-85 (1974). This standard is equivalent to that expressed in 1 *Page on Wills, supra,* § 12.21 at 606, quoted in *Phelps, supra,* 270 Md. at 698, 313 A. 2d at 685:

> " 'The standard of testamentary capacity which has finally been agreed upon, in substance, by the great weight of authority is as follows: Testator must have sufficient strength and clearness of mind and memory, to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform, and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them.' "

As heretofore indicated, the law presumes that a person possesses this capacity and places the burden of proving otherwise upon those seeking to have the testator's will nullified upon the ground of lack of capacity. In the absence of proof of prior permanent insanity, the caveators must show that the testator was incompetent at the time the will was executed in order to overcome the presumption of sanity. *Webster v. Larmore, supra,* 268 Md. at 158, 299 A. 2d at 817, citing *Arbogast, Exec. v. MacMillan,* 221 Md. 516, 523, 158 A. 2d 97, 101 (1960) and other cases. As was said in *Webster,* 268 Md. at 164-65, 299 A. 2d at 820:

> "The rule of our cases is . . . that while testimony tending to establish competency may relate to periods preceding or succeeding the execution of the will, testimony tending to establish incompetency must reasonably relate to the date of execution

[citations omitted]. If that were not so, a caveat action could never be defended, as it frequently is, on the ground that a will was executed at a time when the testator had a lucid interval."

Assuming as we must the truth of the caveators' evidence and all reasonable inferences flowing therefrom, *Webster v. Larmore, supra,* we conclude that the lower court correctly denied the caveatees' motion for a directed verdict and for judgment *n.o.v.*

The record reveals that the caveators produced an abundance of evidence properly bearing on Gloyd's mental capacity. Mrs. Van Metre testified that she had visited Gloyd once or twice a week during the entire time that he was in the nursing home, including late January and early February of 1972. According to her testimony, Gloyd spoke of his deceased relatives — his wife, mother, brothers — as well as friends, as if they were still alive; he would relate events in his childhood as if they occurred that day or the preceding day; contrary to his former behavior, he had no interest in local events, including the activities on his farm; he at times did not recognize Mrs. Van Metre and would address her as his mother; his mental condition gradually worsened during the period that she visited him; and in her opinion, she did not think that "he would know of his assets or could remember all the relatives or their relationships since he couldn't remember many times who I was."

Mary Gloyd, a niece, also visited Gloyd at least once a week during his stay at the nursing home. Her testimony corresponded to that of Mrs. Van Metre. She said that Gloyd would always ask about his mother who died in 1919; he made frequent references to his deceased brothers, as if they were alive and currently working the farm; and he made other remarks about past events as if they were presently occurring. The witness visited Gloyd on February 4, 1972, the day after the contested will was signed, and she remarked that his condition was the same as it had been on the other occasions when she visited. Based upon her knowledge of Gloyd's actions and appearances, and upon the facts that she had described, the witness opined that Gloyd

did not have sufficient understanding of the nature of the business in which he was engaged, a recollection of his property, or the identity of the different persons who would have been the objects of his bounty.

Gloyd's attending physician, Dr. John G. Lodmell, testified for the caveators. He had made eight personal visits to Gloyd during his hospitalization and confinement, including visits on November 13, 1971, and February 25, 1972. Dr. Lodmell testified that, in addition to suffering from urinary blockage, which led to his hospitalization in the Montgomery General Hospital immediately before his admission to the nursing home, Gloyd suffered from generalized arteriosclerosis, encephalomalacia, and senility. He also suffered frequently from dehydration, during which time he would be almost comatose for periods of several days. The witness testified that at other times, when Gloyd appeared alert and witty, he still was not oriented to time, place or surrounding events, and he would talk about the distant past as if it were the present. Dr. Lodmell said that Gloyd's physical condition was irreversible, and, even at his best, he lacked the mental capacity to make rational judgments; to look after himself; and to perform essential personal care. Dr. Lodmell stated that Gloyd was not, at any time during his stay at the nursing home, capable of understanding the extent of his property or the names of those who may have been the natural objects of his bounty.

We think that this testimony reasonably relates to the time of the execution of the purported will. Mrs. Van Metre visited Gloyd within a week of the date of the signing, and Miss Gloyd within a day following the signing. Their testimony is consistent with that of Dr. Lodmell and with the hospital records admitted into evidence. In this context, that Dr. Lodmell visited the decedent several months before and three weeks after the signing of the will does not render his testimony too remote. The evidence showed a continual and permanent incapacity throughout the decedent's stay at the hospital and nursing home. *Compare Doyle v. Rody,* 180 Md. 471, 25 A. 2d 457 (1942) (diagnosis of cerebral arteriosclerosis, senile deterioration and softening of the

brain three weeks prior to the void transaction); *Lawson v. Ward,* 153 Md. 93, 137 A. 479 (1927) (proper admission of description of testator's behavior two to three months prior to execution of invalid will, where the mental condition was an unchanging one) with *Webster v. Larmore, supra* (evidence of insanity 28 months after the execution of the will); *Arbogast, Exec. v. MacMillan, supra* (insufficiency of the evidence of a urologist who had seen the testator no closer than two months before the execution of the will, who admitted that the testator had clear moments and days, and who did not know whether the testator was lucid the day the will was executed). We conclude that the evidence of testamentary incapacity was not too remote and hence was properly submitted to the jury. In view of the jury's verdict that Gloyd lacked testamentary capacity, we need not reach the issue of the sufficiency of the evidence to establish undue influence and fraud.

The caveatees finally argue that the appointment of Valentine L. Wilson, father of the trial judge's law clerk/bailiff, as foreman of the jury, and the court's failure to inform the caveatees of the relationship constitutes reversible error. The caveatees maintain that the appointment gave rise to the appearance of impropriety and deprived them of their right to challenge Wilson as a juror. While they do not assert any impropriety on the part of either Wilson or his son, they claim that the trial judge was predisposed toward the caveators and, intimating that this predisposition operated through the relationship to influence the jury, they claim that they did not receive a fair trial.

A careful reading of the transcript demonstrates to our complete satisfaction the fairness and impartiality of the lower court in conducting the trial. Consequently, in view of the rule that a relationship between a juror and a witness for one of the parties does not disqualify the juror in the absence of an affirmative showing of prejudice, *see Bristow v. State,* 242 Md. 283, 219 A. 2d 33 (1966); *Goldstein v. State,* 220 Md. 39, 150 A. 2d 900 (1959); *Mills v. State,* 12 Md. App. 449, 279 A. 2d 473 (1971); *Baker v. State,* 3 Md. App. 251, 238 A. 2d 561 (1968); *Borman v. State,* 1 Md. App. 276, 229 A. 2d

440 (1967), the relationship between the juror and the law clerk/bailiff does not require reversal of the judgment.

*Judgment affirmed; costs to be*
*paid by appellants.*